**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**THE UNITED STATES OF AMERICA**

      **v.**                     **S8 16 Cr. 361 (CS)**

**TYRIN GAYLE,**
        **Defendant.**

---

# DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL AND FOR A NEW TRIAL

**Calvin H. Scholar**
**The C.H. Scholar Law Firm, P.L.L.C.**
**225 Broadway-Suite 715**
**New York, New York 10007**
**(212) 323-6922 Telephone**

**Attorney for Tyrin Gayle**

**TABLE OF CONTENTS**

ARGUMENT                                                                         1

I.      STANDARD FOR MOTIONS UNDER RULE 29 AND 33                                1

II.     A JUDGMENT OF ACQUITTAL SHOULD BE GRANTED                               2
        ON COUNTS ONE THORUGH SEVEN BECAUSE THE
        COOPERATING WITNEESSES WHO SUPPLIED THE ONLY
        EVIDENCE OF THE DEFENDANT'S INVOLVMENT WERE
        INCREDIBLE AS A MATTER OF LAW

A.      THE TESTIMONY OF BRENDAN GERMAIN                                        2

B.      THE TESTIMONY OF DAVID AZUA                                            14

C.      THE TESTIMONY OF LAQUAN FALLS                                          15

D.      INSUFFICIENT EVIDENCE TO SUPPORT COUNTS ONE                            17
        THROUGH SEVEN

III.    THE COURT SHOULD CONDITIONALLY GRANT A NEW                             21
        TRIAL

A.      THE TRIAL WAS NOT DECIDED BY A FAIR AND                                21
        IMPARTIAL JURY

B.      TRIAL ERRORS                                                          22

1.      The Testimony Regarding Exhibits 500, 501, and 502 was                22
        Inadmissible Pursuant to Federal Rules of Evidence
        701 and 702

2.      Summary Charts of the Contents of the iPhone Should                   24
        not have been Admitted

CONCLUSION                                                                    25

# **TABLE OF AUTHORITIES**

CASES                                             PAGE

1.  Beechwood Restorative Care Center v. Wiley, 846 F.2d 150 (2d Cir. 1998)    17

2.  Gordon v. United States, 438 F.2d 858 (5th Cir. 1971), cert. denied,    24
    404 U.S. 828 (1971)

3.  In re Oliver, 333 U.S. 257 (1948)    21

4.  Irvin v. Dowd, 366 U.S. 717 (1961)    21

5.  Jackson v. Virginia, 443 U.S. 307 (1979)    1

6.  United States v. Conlin, 551 F.2d 534 (2d Cir. 1977)    24

7.  United States v. D'Amato, 39 F.3d 1249 (2d Cir. 1994)    1, 17

8.  United States v. Ferguson, 246 F.3d 129 (2d Cir. 2001)    2, 21

9.  United States v. Finnerty, 474 F.Supp.2d 530 (S.D.N.Y. 2007)    21

10. United States v. Garcia, 413 F.3d 201 (2d Cir. 2005)    24

11. United States v. Glenn, 312 F.3d 58 (2d Cir. 2002)    1

12. United States v. Gordon, 987 F.2d 902 (2d Cir. 1993)    16

13. United States v. Hamilton, 334 F.3d 170 (2d Cir. 2003)    1

14. United States v. Haynes, 729 F.3d 178 (2d Cir. 2013)    23, 24

15. United States v. Jackson, 368 F.3d 59    1

16. United States v. Johnson, 4 F.3d 904 (10th Cir. 2003)    24

17. United States v. Johnson, 513 F.2d 819 (2d Cir. 1975)    14, 15, 17

18. United States v. Lincoln, 630 F.2d 1313 (8th Cir. 1980)    2

19. United States v. Lorenzo, 534 F.3d 153 (2d Cir. 2008)    14, 17, 21

20. United States v. Matthews , 20 F.3d 538 (2d Cir. 1994)    1

21. United States v. Mulheren , 938 F.2d 364 (2d Cir. 1991)    1

22. United States v. Natal, 849 F.3d 530 (2d Cir. 2017)    24

23. United States v. Nusraty, 867 F.2d 759 (2d Cir. 1989)    14

24. United States v. Puig-Infante, 19 F.3d 929 (5th Cir. 1994), cert. denied,    20
    513 U.S. 864 (1994)

### <u>TABLE OF AUTHORITIES (cont'd)</u>

25. <u>United States v. Robinson</u>, 430 F.3d  537 (2d Cir. 2005)     21

26. <u>United States v. Sanchez</u>, 969 F.2d 1409 (2d Cir. 1992)     2, 21

27. <u>United States v. Samaria</u>, 239 F.3d 228 (2d Cir. 2001)     14

28. <u>United States v. Wiley</u>, 846 F.2d 150 (2d Cir. 1998)     2, 17

STATUTES and CODES             PAGE

1.    21. U.S.C. § 841 (a)(1)     20

2.    Fed. R. Crim. P. 29     1

3.    Fed. R. Crim. P. 29 (a)-(c)     1

4.    Fed. R. Crim. P. 29 (c)(1)     1

5.    Fed. R. Crim. P. 29 (d)(1)     21

6.    Fed. R. Crim. P. 33     1, 2, 21

7.    Fed. R. Evid. 701     22, 23, 24

8.    Fed. R. Evid. 702     22, 23, 24

9.    Fed. R. Evid. 1006     24

The defendant Tyrin Gayle was charged with the crimes of Racketeering Conspiracy (Count 1), Attempted Murder in Aid of Racketeering Activity (Count 2), Assault with a Dangerous Weapon and Attempted Murder in Aid of Racketeering Activity (Count 3), Narcotics Conspiracy (Count 4), Use of a Minor in Drug Operations (Count 5), Firearms Offense (Count 6), and Obstruction of Justice (Count 7).  Trial on the instant matter commenced on September 5, 2017 and concluded after Mr. Gayle was found guilty by a jury on all counts.  The defense hereby respectfully submits this motion to request a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 (c)(1) and to request a conditional ruling on a motion for new trial pursuant to Federal Rule of Criminal Procedure 33.  For the reasons set forth herein, the defendant submits that the guilty verdict on all counts was contrary to the weight of the evidence; was not supported by sufficient evidence; that there was reasonable doubt as to the guilt of Mr. Gayle as a matter of law; and that setting aside the jury verdict and ordering a new trial are in the interests of justice.

## ARGUMENT

## I.     STANDARD FOR MOTIONS UNDER RULE 29 AND 33

Fed. R. Crim. P. 29 requires the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a)-(c).  "The test or determining a challenge to the sufficiency of the evidence asks whether a 'rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  United States v. Jackson, 368 F.3d 59, 63 (2d Cir. 2004) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

The United States Court of Appeals for the Second Circuit has held that "a conviction based on speculation and surmise alone cannot stand."  United States v. D'Amato, 39 F.3d 1249, 1256 (2d Cir. 1994) (quoting United States v. Wiley, 846 F.2d 150, 155 (2d Cir. 1988).  Further, Courts have held that the Government "must do more than introduce evidence 'at least as consistent with innocence as with guilt.'"  D'Amato, at 1256 (quoting United States v. Mulheren, 938 F.2d 364, 372 (2d Cir. 1991)).  In the instant case, the jury was forced to make inferences based on mere speculation because there was a lack of evidence that could establish guilt on every element of the crimes that were actually charged as part of the indictment, specifically whether Mr. Gayle knowingly and intentionally became a member of a conspiracy related to the YTMG street gang.  Compounding the problem, the jury also heard evidence that the defendant submits should not have been admitted at trial.

It is well settled that "a defendant challenging the sufficiency of the evidence faces a 'heavy burden.'"  United States v. Glenn, 312 F.3d 58, 63 (2d Cir. 2002) (quoting United States v. Matthews, 20 F.3d 538, 548 (2d Cir. 1994).  A jury's verdict must be affirmed "so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt."  United States v. Hamilton, 334 F.3d 170, 179 (2d Cir. 2003).  However, no rational trier of fact could have concluded guilt from the evidence the Government supplied at trial.  The lack of credible evidence resulted in an improper conviction which was necessarily a miscarriage of justice which would require a new trial.

1

Fed. R. of Crim. P. 33 states that a Court may "vacate any judgment and grant a new trial if the interests of justice so requires." It is well settled that the defendant bears the burden of establishing that this extraordinary remedy should be applied. However, "a trial court has 'broad discretion ... to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.'" United States v. Finnerty, 474 F.Supp.2d 530, 545 (S.D.N.Y. 2007); See United States v. Ferguson, 246 F.3d 129, 133 (2d Cir. 2001) (quoting United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992)). In order to determine whether to grant a new trial, the trial Court is not limited and the Court can weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.'" United States v. Sanchez, at 1413 (quoting United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980)). The Court in United States v. Ferguson, 246 F.3d 129, 133 (2d Cir. 2001), held that the trial Court should not supplant the jury's credibility assessment with its own finding. However, Judge Chin held in United States v. Finnerty , 474 F.Supp.2d 530, 545 (S.D.N.Y. 2007) that in cases in which a lack of credible evidence has resulted in an improper conviction, the "overriding concern of a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice."

II.   **A JUDGMENT OF ACQUITTAL SHOULD BE GRANTED ON COUNTS ONE THROUGH SEVEN BECAUSE THE COOPERATING WITNESSES WHO SUPPLIED THE ONLY EVIDENCE OF THE DEFENDANT'S INVOLVEMENT WERE INCREDIBLE AS A MATTER OF LAW**

## A. THE TESTIMONY OF BRENDAN GERMAIN

"Maybe I'm confused." (Trial Transcript ("Tr.") at 923. The Court made that statement during the second day of testimony of Brendan Germain a/k/a Bravo, a cooperator called to testify by the Government during the trial of Tyrin Gayle. Germain testified during three (3) trial days ostensibly because he was a prime source of information as to the structure of the YTMG street gang and the role Gayle supposedly played in that gang. However, during the course of his testimony, he undermined the Government's case. Notably, Germain acknowledged that he had been cooperating with the Government since June of 2016 (Tr. at 1043); that he had intentionally withheld information about his involvement in an attempted murder wherein multiple people had been shot (Tr. at 977-979); that he had misled the Court, the Government, and his attorney when he pleaded guilty under oath pursuant to his initial cooperation agreement (Tr. 977-99, 1051-1053); and that despite his making intentionally false statements he was not prosecuted, but given a new cooperation agreement from which he could possibly expect a sentence of time served (Tr. at 980). Those facts should have made Germain incredible as a matter of law at that instant.

However, the one area of testimony that best highlighted his lack of credibility was the description of the role that Yellow played in the instant case. When asked about the people from his neighborhood, Germain testified as follows (Tr. at 921):

Q. And what happened that day?

2

A. It was -- I believe it was G's birthday. We were having like a little cookout on William Street. At this time, one of my customers –

Q. Let me just stop you there. Who's G again?

A. Just somebody from William Street.

Q. And who was there?

A. At first it was only myself, Brisko, Yellow, Mike and Shaka, which are also just guys from William Street.

Q. Is Yellow just a guy from William Street?

A. Yeah.

The trial was in its second week and the Government had already asked civilian and law enforcement officers to confirm that Yellow was indeed part of the YTMG street gang. Obviously, Germain's testimony surprised the Government and emphasizing that Germain was now undermining the case, the prosecutor asked Germain to clarify whether Yellow was indeed "just a guy from William Street."  (Tr. at 921).  Germain said "yeah."  (Tr. at 921).

Germain was asked again to describe his associates and he made clear that he could differentiate between those he claimed were members of the YTMG street gang and those people who were just guys from the neighborhood.  (Tr. at 922):

A. At this time, Spazzo was out there, Stackz was out there, Swavey was out there.

Q. Remind us, who's Swavey?

A. Swavey's just an associate of ours.

The Government then asked Germain to continue to describe the events of that particular day and Germain contradicted himself, identifying Yellow as someone who was involved in a shooting only after the Court confronted him with his testimony (Tr. at 923):

Q. And what happened?

A. He basically said, all right, you don't wanna drive, he'll have Yellow drive the car.

Q. And did Yellow and Greedy take the car?

A. Yes, ma'am.

THE COURT: Are we now talking about Armad Evans or the Yellow who was at the barbecue with you?

THE WITNESS: Armad Evans. It's the same person.

THE COURT: Oh. I thought you said that the Yellow at the barbecue was just a guy from William Street.

3

THE WITNESS: No, no. Excuse me.

THE COURT: Maybe I'm confused.

The Court had caught Germain in a falsehood.  The Government then directed Germain through a series of improper leading questions (Tr. at 923-925):

Q. So Yellow was there at the barbecue earlier that day?

A. Correct.

Q. And that Yellow was Armad Evans?

A. Correct.

Q. And he is a member of YTMG?

A. Yes, ma'am.

The Government even provided testimony of its own (Tr. at 924):

Q. But there were other individuals there who were not YTMG members.

At the time that you brought the car back to William Street, were there other YTMG members there?

A. Yes, ma'am.

That exchange in conjunction with Germain's own admissions about misleading the Government during proffer meetings and falsely testifying under oath at his change of plea hearing rendered Germain incredible as a matter of law.  There were additional areas where Germain's testimony was suspect.

Germain gave three different dates for a shooting supposedly committed by Tyrin Gayle. Germain testified that Gayle committed a shooting in December of 2011.  (Tr. at 907). Corrected by the prosecutor, Germain testified that Gayle's shooting took place on December 11, 2016.  (Tr. at 907).  His final answer was that the shooting took place on December 11, 2015. (Tr. at 907).

Demonstrating his ability and willingness to carve people out of an association with YTMG, Germain testified that G was a member of YTMG (Tr. at 918) only to testify a few minutes later that G was just someone from William Street (Tr. at 921).

Germain was an important witness for the prosecution as he was the only witness to testify that he had actually observed Gayle discharge a firearm in a crime related to the conspiracy.  However, his admissions that he had given false testimony under oath and his contradictory testimony during the trial rendered him incredible as a matter of law (Tr. at 929).

4

Describing a shootout supposedly involving Gayle, Germain testified that Gayle was positioned on Hasbrouck Street in Newburgh (Tr. at 929):

Q. Where is Spazzo?

A. More towards Hasbrouck Street.

Previously, Germain had testified that Gayle had taken a gun away from Baby Thot because Baby Thot was too afraid to shoot.  (Tr. at 927)  A few minutes later, Germain had given testimony that Gayle and Baby Thot were a half block away from one another.  (Tr. at 929).  The prosecutor, aware that Germain's testimony now made it impossible for Gayle to be close enough to Baby Thot to secure a weapon, impermissibly corrected Germain and asked him leading and improper questions (Tr . at 929):

Q. More towards what?

A. More towards William Street.

Q. Closer to the corner of William Street and Hasbrouck Street?

A. Correct.

It is important to note that no other witness at trial stated that they ever saw Gayle discharge a firearm in connection with the conspiracy to possess narcotics or a violent act in aid of a racketeering conspiracy.  There were no videos or photographs of Gayle with a firearm.  The police searched Gayle's home and did not locate any firearms.  (Tr. at 439).  During the search the police recovered ammunition, however, none of the singular bullets recovered were of a caliber that would have worked in any firearm connected to Gayle during the testimony of Germain or Falls.

Germain could not even remember the dates of his own criminal charges.  When asked about his involvement in a shooting wherein an innocent bystander had been shot, Gayle on September 13, 2017 testified that he was charged for that shooting in October of 2017.  (Tr. at 953):

Q. Were you eventually charged with that shooting?

A. Yes, ma'am.

Q. When were you charged with that shooting?

A. In October of 2017.

The prosecutor than improperly asked leading questions to rehabilitate Germain (Tr. at 953):

Q. Mr. Germain, I just want to go back for a second. When I asked you when you were charged with that shooting, you said October 2017.

A. Correct.

Q. It's currently –

A. Excuse me, excuse me. August of 2017.

Germain's willingness to provide false testimony was further demonstrated during the cross examination conducted by Sam Braverman.  When confronted about his willingness to provide false testimony, Germain explained (Tr. at 1039):

A. Contradict.  Because I met with the government on numerous occasions, so sometimes my recollection could be certain -different at certain times

Mr. Braverman demonstrated that Germain had made conscious choices to withhold or change information to suit his own needs.  The demonstration culminated in an exchange with Germain over the various kites that he wrote to other inmates regarding the instant case (Tr. at 1058-1071):

Q. Now, you've already described what each one of them are.  And correct me if I'm wrong.  Did you tell this jury that when you wrote back, you sent a kite back to Mr. Gayle, you did not discuss the case at all?

MS. KELLY: Objection, your Honor.

A. No, sir. I never wrote a kite back.

Q. Okay. You sent back a third-party message?

A. Correct. Q. Did you ever send a kite to Mr. Gayle?

A. No, sir.

Q. When you sent a message back by third party to Mr. Gayle, did you discuss the facts of the case at all in that kite?  I mean that third-party message.

A. Basically that tell him that I had copped out.  To that extent. Basically, that was about it.

Q. Okay.  That was it?  Nothing more than that?

A. Correct.

Q. Now, I think we're clear about this, but let's make sure.  You had said that if there's a separation order between you and somebody else -- your words -- no way, shape or form can you have communications with somebody else, correct?

A. Correct.

Q. But we know that's not true, right?

A. Yes.

Q. Because even when you have a separation order, you can still send a kite to somebody, correct?

6

A. Correct.

Q. And they can send a kite back to you, right?

A. Correct.

Q. And you can get third-party information to somebody, right?

A. Correct.

Q. And they can get third-party information back to you?

A. Correct. There's only so much I believe the jail can probably do because, you know, there's a lot of individuals, so –

Germain continued to deny that he had been manipulating the jail system to communicate with other inmates until he was confronted with his false testimony.

Q. Okay. Nonetheless, you could have these communications even when you're on separation orders, right?

A. To some degree, yes, sir.

Q. How long can kites be? Are they short, long?

A. They can be whatever I guess the topic was or however.

Q. I mean, they could be a of couple pages, right?

A. Correct.

Q. When you met with the government, did you ever tell the government that you had not sent any kites to Mr. Gayle?

A. Correct, yes, sir.

Q. That's what you told them?

A. Correct.

Q. And that's what you're telling the jury now?

A. Correct.

Q. And when you were at the jail, was your cell 2 Northeast 31 cell in the new jail?

A. Correct, sir.

Q. Did you know where Mr. Gayle lived when he was in Newburgh?

A. In Overlook Street. That's all I know.

Q. That's all you remember?

A. Correct. Q. What's the address of the jail, Valhalla?

A. Valhalla, New York, 10595.

Q. Is it 10 Woods Road?

A. I believe it could be, yes, sir.

Q. Were you there on the 15th of September of 2016?

A. On the 15th, yes, sir, I was in Valhalla.

Q. Still there at the time, right?

A. Correct.

Q. And you used the nickname around that time of Bravo, correct?

A. Correct.

Q. When you sent communication to Mr. Gayle third party, whatever, did you ever ask him to -- by any means necessary, did you ever ask him to get back to you to invite more conversation with him?

A. No, sir.

Q. Never did that?

A. No, sir.

Q. Are you familiar with the phrase hit me back?

A. I'm familiar with that phrase, yes, sir.

Q. What does that mean to you?

A. Basically to get back in contact with somebody.

Q. So if you sent a text to somebody and said hit me back, you're asking them to text you back, right?

A. Correct.

Q. And if you wrote to somebody and said hit me back, you're asking them to write back to you?

A. Correct.

Q. What does ASAP mean?

A. As soon as possible.

Q. Okay. MR. BRAVERMAN: May I approach the witness, please.

8

THE COURT: Yes.

MS. KELLY: Could we see a copy of what you're showing? Could we just have a moment to look at it, your Honor.

THE COURT: Yes. (Pause)

MS. KELLY: Can we have a sidebar, your Honor?

THE COURT: Okay.

(At the sidebar) THE COURT: Yes.

MS. KELLY: Your Honor, we just were shown a document which we've never seen before.

THE COURT: Well, of course. It's cross-examination.

MS. KELLY: But we want to know if the purpose -- are you going to seek to introduce this document into evidence or are you seeking to refresh the witness' recollection?

THE COURT: Sounds like he's impeaching him because the witness, among other things, never said something like hit me back.

MR. BRAVERMAN: And never sent a kite back.

THE COURT: Well, I don't know if that's a kite. It looks like U.S. Mail.

MR. BRAVERMAN: He identifies it as a kite, calls it a kite.

THE COURT: But he specifically just now said -- the question was and in any of your communications, through third parties or by any means, did you ever say something like hit me back, and he said no, and did you ever say something else. So, I mean, this is impeachment. That's what it is.

MS. KELLY: Your Honor, the reason we asked to look at it and, upon looking at it –

THE COURT: You're entitled to look at it.

MS. KELLY: Yes, but, upon looking at it, there appears to be issues regarding its authenticity. There are different forms of handwriting on it.

THE COURT: Well, you've got a witness on the stand who is perfectly capable of saying I didn't write this, it's not real. That's what cross-examination is. The first question is going to be do you recognize this, and if he doesn't, he'll say so. But assuming Mr. Braverman has a good-faith basis for thinking it came from the witness, it's fair game. Just make sure you put an exhibit number on it.

MR. BRAVERMAN: Sure, Judge.

MS. COMEY: When we asked you for discovery in this case, you said you had -

9

THE COURT: One does not have to disclose discovery that one is going to use to impeach.

MS. COMEY: So, for the record, you are not putting it in as an exhibit?

MR. BRAVERMAN: No.

In open court; jury present) MR. BRAVERMAN: Judge, may I approach the witness?

THE COURT: Yes.

MR. BRAVERMAN: Judge, I've marked this, for identification purposes only, as Defendant 1.

BY MR. BRAVERMAN: Q. Mr. Germain, I'm going to show you something here. I would like you to take a look at that, sir, if you would. (Pause)

Q. Have you had a chance to review it, sir?

A. Correct.

Q. Fair to say that's a letter from you to the defendant?

A. A letter that I never actually sent to the defendant. I don't know how this defendant was in -- Spazzo got this letter. I wrote the letter, but I don't know -- I never sent it in the mailbox, so how he got the letter –

Q. Let's break it down one more time. You wrote that letter, right?

A. Correct.

Q. It's your handwriting, right?

A. Correct, sir.

Q. You recognize that, right?

A. Correct.

Q. And then -- so when you wrote that letter, among other things, for instance, I asked you before whether or not you've ever said hit me back ASAP to the defendant, but, in fact, you did write that, correct?

A. I wrote this letter, yes, sir.

Q. Okay. I'm not going to go into the contents other than the specifics of what I'm asking you. One of the specifics that I'm asking you is when I asked you before have you ever said -- written to the defendant hit me back ASAP and you said no, I haven't, reality is that you did, correct?

A. Correct. I wrote it in this kite, but this kite was never sent out.

Q. And that you would call a kite, right?

A. Correct.

Q. And in addition to this, you said before that you've never sent him a kite, right?

A. No, sir.

Q. Okay. Let me ask you this. Do you recognize the envelope that's stapled to this Defendant's 1?

A. Correct.

Q. Do you recognize your handwriting on the envelope?

A. Correct.

Q. Do you recognize your name on the envelope?

A. Correct, sir.

Q. Do you recognize the postmark on the envelope?

A. Westchester County. Correct.

Q. Now, I had asked you before about September 15th of 2016, right? Just for identification purposes, it's postmarked September 16th, 2016? September 15, 2016. Correct?

A. Correct.

Q. I'll take that back now. Did you ever send any kites to Mr. Gayle?

A. No. I wrote that letter out because I was contemplating about sending that letter in the envelope, but I actually never sent the letter. So how that letter was placed -- and at that time, I wasn't in 2 Northeast. I wasn't in 31, sir. I was in 7 at the time, sir.

MR. BRAVERMAN: I will mark this as Defendant's Exhibit for identification number 2.

THE COURT: Actually, if it's not too late, can we make Defendant's 1 into Defendant's A and make this one Defendant's B.

MR. BRAVERMAN: Yes, Judge. I will do that. May I approach the witness again?

THE COURT: Yes.

Q. Mr. Germain, I'm going to show you what's been marked for identification as Defendant's B. Take a look at that. Take a look at that so you have a chance to read that. (Pause)

A. Correct, sir.

Q. What is Defendant's B?

11

A. Excuse me?

Q. What is Defendant's B? What is that?

A. Is that me? I don't -- Defendant's B. What do you mean?

Q. The piece of paper in front of you.

THE COURT: The exhibit that was just handed to you.

A. This is a kite.

Q. Who wrote that?

A. This is the same kite which was written around the same time I  wrote the other kite.

After initially denying that he never sent a kite to Gayle to discuss the case, Germain was now admitting that he had sent at least two (2) kites to Gayle and in at least one, he had    asked Gayle to communicate with him.

Q. So you wrote this kite, correct?

A. Correct, sir.

Q. And that's your handwriting on it, right?

A. Correct, sir.

Q. And this was written by you while you were at Valhalla, correct?

A. Correct, sir.

Q. In fact, it looks like it's from the same notebook. You had a notebook in your cell?

A. Correct, sir.

Q. You recognize the same handwriting, right?

A. Correct, sir.

Q. Fair to say that when you sent kites to -- let me ask you this. When you wrote this kite, you discussed the facts of your case, correct?

A. Yes, sir. THE COURT: Who was that written to?

THE WITNESS: It was written for Spazzo.

Q. Written -- I'm sorry. What did you say there? I didn't hear that.

A. I had  written -- I  was  in  my  cell  at  night  writing.  And  I  was  just  writing  in  my notebook. I was writing the kites.

Q. Okay.

12

THE COURT: I thought he said it was written for Spazzo.

THE WITNESS: Written for Spazzo, yes. I was writing.

Q. Did you write any other kites?

A. No, sir.

Q. I show you what's marked as Defendant's C for identification. Mr. Germain, would you take a look at Defendant's C, please. I want you to read it to yourself and take a look at it, and I'll ask you some questions.

A. Correct.

Q. Recognize the handwriting on this one?

A. It's my handwriting.

Q. How many pages?

A. Roughly about eight pages.

Q. Who is this written to?

A. This kite was -- all these kites were written around the same time. It was written in a notebook, all in a notebook.

Q. They were all written to Tyrin Gayle, correct?

A. No, sir. This kite was all written in a notebook around the same time.

Q. Who was this one written to?

A. I believe Stackz.

Q. Stackz?

A. Correct.

Q. Okay. So in this one that's written to Stackz, do you discuss the case at all?

A. Correct.

Q. Fair to say that, in your kite, you discuss sentencing issues?

A. Correct.

Q. Discuss criminal conduct?

A. Correct, sir.

Q. Discuss pleading guilty, not pleading guilty?

A. Correct.

Germain was incredible as a matter of law. His testimony established that he had withheld certain information and also tried to carve out Yellow from being part of the YTMG street gang. Clearly, Germain had the means, motive, and opportunity to simply substitute Gayle's name for one of his associates that he had already carved out and protected from prosecution. Moreover, he had the ability to communicate that plan with other inmates including Falls and specifically, David Azua. Germain had contacted Azua in order to have Azua request that the prosecutors remove a separation order that prevented the two men from having contact. (Tr. at 1016) even though Germain claimed that his concern was that the separation order prevented Germain from having a job at the GEO prison facility. (Tr. at 1016). Further, demonstrating his willingness to manipulate circumstances and also defy the prosecutors who had obviously advised him not to contact other inmates, Germain reached out to Azua to do his bidding and Azua complied. In order to frustrate the discovery of his manipulation and destroy evidence, Germain simply ripped up and flushed his kites down the toilet. (Tr. at 988). Germain's testimony undermined Falls and Azua, the only other cooperators to support a contention that Gayle was the person involved in the conspiracy as opposed to any of the many people Germain had stated were mere associates, not connected to YTMG. Germain's testimony rendered the testimony of Falls and Azua incredible as a matter of law.

As a result of Germain's manipulation, the jury was supplied testimony that was incredible as a matter of law and they were forced to make inferences based upon mere speculation because there was a lack of evidence that could establish guilt on every element, specifically that Tyrin Gayle was the person who committed the instant crimes. The Court of Appeals for the Second Circuit has noted that "specious inferences are not indulged because it would not satisfy the Constitution to have a jury determine that the defendant is probably guilty." United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008).

"[O]nce a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming." United States v. Nusraty, 867 F.2d 759, 762 (2d Cir. 1989) (internal quotation marks omitted). However, "[s]uspicious circumstances ... are not enough to sustain a conviction for conspiracy," Id. at 763. Further, "mere association with those implicated in an unlawful undertaking is not enough to prove knowing involvement," Id. at 764. Similarly, "a defendant's mere presence at the scene of a criminal act or association with conspirators does not constitute intentional participation in the conspiracy, even if the defendant has knowledge of the conspiracy" United States v. Samaria, 239 F.3d 228, 235 (2d Cir. 2001). The cooperators' testimony should have been rejected because of the manipulation of Germain, the evidence provided a theory and an interpretation that was as consistent with Gayle's innocence as it was to the Government's theory of guilt. United States v. Johnson, 513 F.2d 819, 824 (2d Cir. 1975).

## B. THE TESTIMONY OF DAVID AZUA

Azua, a Government cooperator from a gang who was a rival of YTMG, was rendered incredible as a matter of law based upon the manipulation of Germain. Azua testified that he never saw Gayle or knew who he was despite his many contacts with the main rivals of YTMG of which the Government claimed Gayle was the leader. (Tr. at 581). When asked to name the

14

members of YTMG, Azua identified only Yellow, Greedy, Baby Thot, and Stackz.  (Tr. at 543).
In fact, Azua did not even know the name of the rival gang, identifying it as "YCMZ."  (Tr. at
540).  The correct answer was supplied by another improper leading question.  (Tr. at 540).

Azua's significance was based on his observation of a shootout during which, he claimed
that Baby Thot shot at him from a black car.  (Tr. at 553).  He was not able to identify anyone
else inside the car.  (Tr. at 553).

Gayle was later discovered pinned inside the vehicle, but the police did not recover any
firearm from any of the occupants of the vehicle or inside the vehicle.  There were no bullets
located on any other occupants of the vehicle and no gunshot residue tests were performed to
determine if a shot had been fired from either a passenger of the vehicle or within the vehicle.

Newburgh Police Detective Frederick was called to buttress Azua's testimony and
described the crashed vehicle as well as locating Gayle pinned inside of it.  For his part,
Frederick testified that he also located a .38 revolver that was located on the street.  (Tr. at 596).
Frederick testified that he located the .38 close to his police car.  (Tr. at 596).  Frederick did not
testify regarding the proximity of the .38 to the crashed vehicle.  Further, Frederick testified that
he left the scene immediately after arriving in order to respond to reports of an armed gunman
running through a schoolyard.  (Tr. at 593).  Frederick was away from the scene for several
minutes and located the .38 when he returned to his vehicle.  (Tr. at 596).  Frederick also testified
that police recovered a live .40 caliber cartridge at the intersection across from where the black
car had crashed.  (Tr. at 598).  Apart from Azua, no witnesses testified to observing anyone
inside the black car possessing a firearm.  The defense submits that Azua's testimony, when seen
in connection with Germain's testimony, was incredible as a matter of law.  Thus, without his
testimony, the evidence provided a theory that a person with a .40 caliber weapon shot at the
black car as it crossed through the intersection, the black car crashed, and the .38 was dropped
by one of the shooters on the street reported to the police as fleeing from the scene.  Again, the
evidence established a theory and an interpretation that was as consistent with Gayle's innocence
as it was to the Government's theory of guilt.  United States v. Johnson, 513 F.2d 819, 824 (2d
Cir. 1975).

The defense submits that Azua was incredible as a matter of law in that his testimony was
rendered incredible on its face when viewed in the light of Germain's manipulation of the
evidence.  It is important to note that Azua could not even remember whether the shooting
occurred in 2015 or 2016.  (Tr. at 549).  However, Azua would later acknowledge that Germain
had contacted him while they were both at the GEO detention facility; that Germain had
requested that Azua request that the prosecutor remove the separation order preventing them
from having contact; and although Germain was from a rival gang that had recently tried to kill
him, Azua was inexplicably willing to do Germain's bidding.  (Tr. at 577).  Azua's testimony
was simply incredible on its face.

## C. THE TESTIMONY OF LAQUAN FALLS

The "testimony of a single accomplice" is sufficient to sustain a conviction "so long as
that testimony is not incredible on its face and is capable of establishing guilt beyond a

reasonable doubt." <u>United States v. Gordon</u>, 987 F.2d 902, 906 (2d Cir. 1993).   Laquan Falls was another cooperator called to testify by the Government at trial.   Falls testified that he "lied" during the very first meeting with the Government.   (Tr. at 337).   The defendant submits that those intentionally false statements as well as his demonstrated willingness to withhold evidence rendered Falls incredible as a matter of law.   Any value that Falls had as a witness was further undermined by the later testimony of Germain.   For example, Falls testified that Rashun Brown, Yellow's brother, was a member of YTMG.   (Tr. at 248).   Germain, in another example of a manipulation of the evidence to protect Yellow, never mentioned Rashun Brown as a member of YTMG despite being asked several times to identify all of the members of that street gang.

Moreover, Falls testimony was the result of improper and impermissible leading that occurred throughout the trial.   At one point, the Court stated that the Government was "mad leading."   (Tr. at 958).   Fall's importance as a witness was based upon his claim that Gayle confessed to committing a shooting as revenge for the shooting of Falls.   The only problem with Falls' claim was that he admitted that he was not sure of the conversation with Gayle.   (Tr. at 218).

The prosecutor asked (Tr. at 218):

Q. Now, are you 100 percent positive about that part of the conversation?

Falls responded (Tr. at 218):

A.  No.

Q. But let's talk about it anyways.

The Government impermissibly and improperly supplied testimony through leading questions and questions that were based solely on speculation (Tr. at 219).

For his part, Falls stated that he had only been on one shooting and he committed that shooting with Yellow between 2015 and 2016 (Tr. at 214).   However, he was asked about several conversations regarding Gayle which involved shootings of which he could not remember details.

With respect to the narcotics conspiracy, any testimony from Falls was the result of impermissible and improper leading which necessarily suggested the answers to him.   When asked about Baby Thot's sales of narcotics, Falls simply stated that Baby Thot did not sell as much as him.   (Tr. at 187).   However, the Government then asked the following, clearly suggesting the preferred answer (Tr. at 187):

Q. Not as much as you, Stackz, and the Defendant?

A. Yes.

16

The Government then posed a series of impermissible hypothetical questions to Falls about drug dealing which were not limited to a specific time or date (Tr. at 191):

Q. Let's break that down a little bit. So, if a customer comes up to, say, you and the Defendant and says, "I want 50," what do you take that to mean?

A. Um, what did the -

The prosecutor then followed up the question with another hypothetical situation not limited to any specific instance (Tr. at 191):

Q. And so what would you and the Defendant do in order to split that customer?

A. Each give the customer $25 apiece worth of crack.

The defendant submits that Falls, Azua, and Germain were incredible as a matter of law. The evidence highlighted by the Government throughout the trial, even when considered in the aggregate, lacked a critical element—any clear evidence from which a jury could reasonably infer that Gayle was a member of the conspiracy rather than "just a guy" from the street whose name was substituted to protect the true members of YTMG.

## D. INSUFFICIENT EVIDENCE TO SUPPORT COUNTS ONE THROUGH SEVEN

A conviction based on speculation and surmise alone cannot stand. United States v. Wiley, 846 F.2d 150, 155 (2d Cir. 1998). As noted, mere associations with those members of a criminal enterprise or mere presence is not enough to sustain a conviction. To the extent that the Government relied on false statements provided by Gayle through a kite, the Second Circuit has held that "[w]hile false exculpatory statements made to law enforcement officials are circumstantial evidence of a consciousness of guilt and have independent probative force, ... falsehoods told by a defendant in the hope of extricating himself from suspicious circumstances are insufficient proof on which to convict where other evidence of guilt is weak and the evidence before the court is as hospitable to an interpretation consistent with the defendant's innocence as it is to the Government's theory of guilt." United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008) (quoting United States v. Johnson, 513 F.2d 819, 824 (2d Cir. 1975).

The defendant submits that the testimony the cooperators supplied was not credible on its face. Further, any remaining testimony or evidence that supported the Government's theory of guilt was obtained through the use of improper questioning which should have been stricken from the record. The Government placed Gayle's trial counsel in an undesirable position: having to decide whether to object to the repeated improper questions and prosecutor testimony, thereby repeatedly highlighting the highly prejudicial testimony or say nothing in hopes that the jury would miss the prejudicial testimony during the confusion. However, the repeated leading questions and prosecutorial testimony during questioning should have been stricken from the record, leaving only the circumstantial evidence that was "at least as consistent with innocence as with guilt." D'Amato, 39 F.3d at 1256.

For the aforementioned reasons, the defendant submits that there was a lack of credible evidence from which any rational jury could have concluded guilt on any of the counts of the indictment. Specifically, as the cooperator testimony was incredible as a matter of law, there was no credible evidence that Gayle had joined the racketeering conspiracy alleged in Count One. As noted, Germain's testimony made it abundantly clear that he could have simply substituted Gayle's name for that of any of the people he identified who he claimed were simply "guys" from the neighborhood. Germain was careful to carve those other people, associates and members of other gangs, out of the conspiracy, and therefore protect them from prosecution because they would then be part of a separate conspiracy not charged in the instant indictment.

There was a lack of credible evidence to sustain convictions for the violent acts in aid of racketeering activity alleged in Counts Two and Three. No unbiased witness testified that they ever observed Gayle possess, brandish, or discharge a weapon. For those reasons, the defendant submits that the Court should also grant a judgment of acquittal for the firearms offense charged in Count Six. To the extent that there was a video of Gayle in the presence of weapons including a TEC firearm, his mere presence (Tr. at 262) would not have been sufficient to sustain a conviction absent the incredible testimony offered from Falls and Germain. Indeed, if possession of a firearm could be established through the video admitted in evidence wherein guns were displayed prior to Gayle's appearance (Tr. at 262), that possession would be a New York State crime, rather than a federal offense. Again, the majority of the evidence connecting Gayle to any weapons was presented through the testimony of Falls and Germain who were both incredible as a matter of law.

Similarly, there was a lack of credible evidence that connected Gayle to the narcotics conspiracy charged in Count Four. If the Court is persuaded that Falls and Germain were incredible as a matter of law, the remaining evidence would establish only that Gayle distributed much less than 280 grams of "crack cocaine." To the extent that evidence of Gayle's drug sales were recorded on Facebook Live or surveillance videos, there was no witness, other than Falls and Germain, who testified as to the frequency or amounts or even the types of drugs sold over the period specified in the indictment.

Throughout the trial, the Government attempted to establish the ages of Yellow and Baby Thot to support the theory of guilt for the crime of the use of a minor in drug operations charged in Count Five. Any evidence that either Yellow or Baby Thot were under eighteen years of age during the period charged in the indictment was supplied by speculation or impermissible hearsay testimony.

Initially, the Government sought to prove the age of Armad Evans a/k/a Yellow through the testimony of Detective Rodriguez. (Tr. at 94). Detective Rodriguez testified that he compared a photograph and was able to recognize Evans in Facebook photographs. (Tr. at 94). The Government then inquired the following (Tr. at 94):

Q. Were you also able to learn his date of birth?

A. Yes.

Q. How old was he at the time?

A. Seventeen.

The Government did not ask Detective Rodriguez to supply the date of birth for Evans and the prosecutor failed to establish any specific time at which Evans had been 17 according to the detective. For example, was Evans 17 in the photographs that the detective had seen and if so, were those photographs taken before or after the instant crimes were alleged to have commenced? In fact, such testimony prompted a question from the Court (Tr. at 95);

THE COURT: And was it before he was 18?

THE WITNESS: That I don't know.

MR. BRAVERMAN: Don't know.

THE COURT: Do you know when he turned 18?

THE WITNESS: I do not know his date of birth off the top of my head.

Having failed to provide testimony about whether Evans was seventeen during the period charged in the indictment, it was improper to allow the detective to testify as to his speculation regarding Evans' age and the answer should have been stricken. Indeed, even if another person had told the detective Evans' age, such testimony would have been impermissible hearsay and such testimony should not have been admissible.

The Government employed the same strategy of suggesting the ages of Evans and Brown a/k/a Baby Thot throughout the trial through the use of impermissible hearsay (Tr. at 97, 161, 163, 187, 188, 189, 191, 271, 869). However, there would be no evidence of the date of birth for either individual. In fact, the Government never sought to admit a certified birth certificate, the testimony of an officer who obtained pedigree information, or a certified criminal history or "rap sheet" prepared by New York State's Division of Criminal Justice based on fingerprints for situations wherein the prosecution needs to establish a person's date of birth.

With respect to David Brown, the Government elicited the following (Tr. at 97):

Q. And, Detective, you also mentioned David Brown. How are you able to recognize David Brown?

A. Again, through Facebook photos, posts, videos, and comparing that information to our internal system.

Q. From your internal system, were you able to determine how old he was?

A. Yes.

Q. How old was he at the time when you observed him during these controlled buys?

A. Seventeen.

Detective Rodriguez had testified that his investigation into YTMG had begun in about 2015 and continued into 2016. (Tr. at 85-86). However, his testimony was undermined by the testimony of David Azua who stated that he knew Brown personally and had talked to Brown in the house belonging to Brown's sister due to a conflict between two gangs. (Tr. at 548). According to Azua, the conversation with Brown occurred in 2014. (Tr. at 548). If Brown was 17 in 2015 or 2016 according to the testimony offered by the Government, then Brown would have been at least 14, 15, or 16 years old in 2014. However, the Government never asked Azua about Brown's age. The failure to secure that information from someone personally familiar with Brown highlighted the weakness of the evidence proffered by Detective Rodriguez.

The evidence of the ages of Yellow and Baby Thot presented at trial was insufficient as a matter of law to support the conviction for the crime of use of a minor in a drug operation as charged in Count Five. As noted above, the Government failed to supply any evidence of an actual date of birth for either Evans or Brown. A government issued document containing a date of birth has been held to be sufficient to support a conviction of 21 U.S.C. § 841 (a)(1). United States v. Puig-Infante, 19 F.3d 929, 948 (5th Cir. 1994) cert. denied, 513 U.S. 864 (1994). However, the Government failed to establish the ages of Evans or Brown through any credible evidence. For those reasons, the defendant submits that the Court should enter a judgment of acquittal for Count Five.

The defendant submits that the Court should also enter a judgment of acquittal for the crime of obstruction of justice as charged in Count Seven of the indictment based upon a false affidavit attributed to Gayle which Germain claimed to have obtained through a kite. During his direct testimony, Germain testified that he did not use kites to communicate with Gayle while he was in prison. (Tr. at 1000). Germain later contradicted himself and testified that he withheld information about kites from the prosecution as well as information regarding contact with Gayle because being in Valhalla (where both were housed at the time) was more convenient for himself and his family. (Tr. at 990, 1013). Mr. Braverman confronted Germain with a series of kites that he had written Gayle as well as to others including his co-defendants. (Tr. 1058-1071). Germain then admitted that he had again testified falsely under oath during his direct testimony as well as during the beginning of his cross-examination.

Based upon Germain's testimony about the kites he had written, it was clear that Germain had requested that Gayle do something for Germain. (Tr. at 1058-1071). Germain's testimony should have been stricken due to the Constitutional violations committed by Germain in attempting to obtain incriminating statements from Gayle while he was an agent of the Government and a cooperator. United States v. Johnson, 4 F.3d 904, 910 (10th Cir. 2003). However, based upon his description of the kites that he wrote, Germain was also attempting to obtain a thing of value from Gayle in exchange for something Germain could provide to Gayle. The jury would never know exactly what Germain had promised Gayle or even what Germain had wrote to Gayle because Germain simply ripped up the kites that did not fit his story and flushed them down the toilet. (Tr. at 988-990). In any event, the Court in Johnson held that

"falsehoods told by a defendant in the hope of extricating himself from suspicious circumstances are insufficient proof" when the other evidence of guilt is "weak." Johnson, at 824. If the Court had stricken Germain's testimony due to the Constitutional violation committed to obtain incriminating statements from Gayle or because Germain's testimony was simply incredible on its face, the remaining evidence of guilt was weak and created "an interpretation consistent with the defendant's innocence." Id. No rational juror could have concluded that Gayle was guilty from Germain's testimony. "It would not satisfy the Constitution to have a jury determine that the defendant is probably guilty." United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008). For the aforementioned reasons, the defendant respectfully requests a judgment of acquittal on Count Seven.

## III.    THE COURT SHOULD CONDITIONALLY GRANT A NEW TRIAL

Judge Chin held in United States v. Finnerty, 474 F.Supp.2d 530, 545 (S.D.N.Y. 2007) that "if the Court enters a judgment of acquittal after a guilty verdict, the Court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed." Fed. R. Crim. P. 29 (d)(1). Fed. R. Crim. P. 33(a) permits a Court to "vacate any judgment and grant a new trial if the interests of justice so require." The trial Court has "broad discretion…to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." United States v. Ferguson, 246 F.3d 129, 133 (2d Cir. 2001) (quoting United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992)). "The Court is entitled to 'weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.'" Finnerty, at 545 (quoting United States v. Robinson, 430 F.3d 537, 543 (2d Cir. 2005). "Generally, a Court has 'broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29.'" Id. (quoting United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001). The defendant respectfully submits that substantial errors occurred during the trial and as a result, the interests of justice require a new trial. Initially, the defendant would renew his challenges to the motions in limine presented by the Government.

## A. THE TRIAL WAS NOT DECIDED BY A FAIR AND IMPARTIAL JURY

"The right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." Irvin v. Dowd, 366 U.S. 717 (1961); In re Oliver, 333 U.S. 257 (1948). In the instant case, two jurors were selected who expressed potential prejudice against the defendant and against the subject matter of the instant case. These jurors were ultimately seated without fully exploring the nature of their prejudice.

Ms. Isabel Garcia was questioned during the voir dire of the jury panel and indicated that she had friends who smoked marihuana, but did not engage in anything "like crazy." (Tr. of Voir Dire at 125). At that time, Ms. Garcia had expressed a view that any illicit drug that was stronger than marihuana was not to be tolerated by society.

In addition to Ms. Garcia, Mr. Paul Prencis also spoke to the Court about his relationship to people who used drugs. (Tr. of Voir Dire at 198). Mr. Prencis was clear to distinguish that his

close friend was addicted to "prescription drugs."  (Tr. of Voir Dire at 199).  However, Mr. Prencis was clear that he attributed the death of his close friend to illegal drugs.  (Tr. of Voir Dire at 199).  Although he claimed to have no problem with the subject matter, Mr. Prencis could not bear to speak about his experiences in open Court showing his discomfort with a topic that was central to the case.  (Tr. of Voir Dire at 199).  When asked if he could be fair, Mr. Prencis stated, "I'm pretty sure I can be impartial to that."  (Tr. of Voir Dire at 199).

Both Ms. Garcia and Mr. Prencis were ultimately seated as trial jurors.  (Tr. at 297, 298).  However, their feelings of prejudice that they expressed towards the subject matter and therefore, the defendant, were not explored.  They became jurors who decided the fate of Tyrin Gayle despite the fact that Ms. Garcia had expressed that hard drugs were "crazy" and Mr. Prencis was equivocal about whether he could be fair and impartial.  For the aforementioned reasons, the defendant respectfully submits that he did not receive a fair trial because members of his jury were not fair and impartial.


## B. TRIAL ERRORS

### 1. The Testimony Regarding Exhibits 500, 501, and 502 was Inadmissible Pursuant to Federal Rules of Evidence 701 and 702

At trial the Government supplied testimony that law enforcement recovered a iPhone which they claimed belonged to Tyrin Gayle.  The iPhone was listed as Exhibit Number 500.  The Government wanted to use the contents of the iPhone in summary charts to support their theory that the contents of the telephone provided evidence of Mr. Gayle's involvement in the instant crimes.  See Government Letter dated September 12, 2017, United States v. Tyrin Gayle, 16 Cr. 361 (CS), ECF No. 185.  However, the person who took the contents of the iPhone and put it on a hard drive for further analysis was not available at trial.  (Tr. at 832).  Although there was an incomplete explanation of the chain of custody, the Court ultimately held that any defects in the chain were slight and of little evidentiary value.  (Tr. at 1084-1086).  In any event, the Court fashioned a curative instruction for the jury regarding the break in the chain of custody.  (Tr. at 1191-1192).

However, the more pressing issue was that the Government wanted to call a technician to provide opinion testimony that was inadmissible under Fed. R. Evid. 701.  The Government claimed that technician Enrique Santos would merely testify that certain identifying information was encoded into the material removed from the iPhone and placed into the hard drive.  (ECF No.185).  Further, the Government proffered that Santos' testimony would solely indicate that that identifying information unique to the iPhone was present on the hard drive.  (ECF No. 185).  However, Santos' testimony went well beyond that proffered by the Government.

At trial, Santos testified as follows (Tr. at 1251):

Q. Now, you mentioned that a cell phone extraction usually comes in the form of a forensic image.  Could you explain to us in a little more detail what a forensic image is?

A. A forensic image is a capture of most of the cell phone's data at the point at which the phone was examined.

Q. Now, do you know exactly how much data?

A. It varies from phone to phone.

Q. Can a forensic image be altered once it's taken?

A. No.

Q. Why not?

A. Well, the whole point of a forensic extraction is that it can't be altered.  It's -- it's -- we're trying to recover evidence usually from a device, so we want to try to make it as forensically sound as possible, because if we mistakenly introduce new data into a forensic image, not that it's possible, it could have some really bad consequences for the case.

It is important to note that when he was asked why a forensic image cannot be altered, in his initial answer, Santos did not say anything about certain identifying markers that were embedded into the specific iPhone he had examined.  Rather, Santos testified about matters according to his scientific, technical, or other specialized knowledge that was within the scope of Rule 702 and the Government should have sought his admission as an expert.  Regarding the failure to request that Santos testify as an expert the Court indicated as follows (Tr. at 1083):

THE COURT:  You are inviting an appellate issue in a case where you've got a lot of evidence.  Are you sure you want to do that?

Santos' testimony did not come in as the Government advertised.  Rather, the Government asked Santos a series of questions that ranged from how every cellular telephone is engraved at a factory (Tr. at 1253) to the specific design of the iPhone (Tr. at 1254), and to explain the scientific analysis he performed on the hard drive to examine the contents of the iPhone (Tr. at 1257-1259).

The defendant contends that Santos' testimony was improper and inadmissible as it violated rule 701 in that it was based on "scientific, technical, or other specialized knowledge." Fed. R. Evid. 701 (c).  The Government should have sought admission of Santos' testimony pursuant to Rule 702 which states, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

In United States v. Haynes, 729 F.3d 178, 195 (2d Cir. 2013), the Court held that an Officer's testimony regarding how the fuel tank in a rental car functions was improperly admitted because "his opinion was based on specialized training and experience."  The witness did more than "simply describe what he found in the gas tank and what he perceived.  He described how the float on the outside of the gas tank worked and why the gas gauge would have registered zero to empty while the drugs were in the gas tank."  Id.  This testimony was based on

knowledge that the Officer acquired through his experiences as a border agent inspecting vehicles, "not through the reasoning processes of the average person." Id.

In United States v. Natal, 849 F.3d 530, 537 (2d Cir. 2017), the Second Circuit held that a records custodian employed by a wireless communications provider could not testify as a lay witness about the analysis underlying the use of cell phone records and cell tower locations to determine where a particular cell phone call occurred. The testimony did not "result from a process of reasoning familiar in everyday life."

Santos' testimony went beyond merely describing what he observed and his general knowledge based upon his position as an administrative support specialist. In United States v. Garcia, 413 F.3d 201, 215 (2d Cir. 2005), the Court discussed the last requirement of Rule 701, noting that " a lay opinion must be the product of reasoning processes familiar to the average person in everyday life…The purpose of this final foundation requirement is to prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702….If the opinion rests "in any way" upon scientific, technical, or other specialized knowledge, its admissibility must be determined by reference to Rule 702." Clearly, Santos' testimony was not the "product of a [witness'] investigation," but rather "reflected…specialized knowledge." Id. Further, because his testimony was admitted in violation of Rule 701 and 702, Santos' statements regarding the design of telephones, if all telephones were engraved as he testified, and the other aspects of his opinion were offered without any regard as to whether it was his observation, scientific knowledge, or the result of something else.

## 2. Summary Charts of the Contents of the iPhone Should not have been Admitted

The Government needed Santos to testify in order to elicit testimony about the iPhone and its contents that were placed on summary charts. The charts ostensibly connected Gayle to the instant crimes by the sequence of the entries and the contents of the messages. As noted above, the defendant respectfully submits that Exhibits 500, 501, and 502 were inadmissible either due to the break in the chain of custody or the fact that a link in the chain of custody was supplied by evidence that violated Rules 701 and 702.

Fed. R. Evid. 1006 states that a "proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recording, or photographs that cannot be conveniently examined in Court." Courts have held that "a summary must of course be based on foundation testimony connecting it with the underlying evidence summarized…and must be 'based upon and fairly represent competent evidence already before the jury." United States v. Conlin, 551 F.2d 534, 538 (2d Cir. 1977) (quoting Gordon v. United States, 438 F.2d 858, 876 (5th Cir. 1971) cert. denied, 404 U.S. 828 (1971). Admissibility of summary charts depends on the admissibility of the underlying facts and data that they purport to summarize. Beechwood Restorative Care Center v. Leeds, 856 F.Supp.2d 580, 597 (W.D.N.Y. 2012). In the instant case, the summary charts as well as the testimony of the excerpts from the contents of the iPhone (Tr. at 1271-1351) were inadmissible because the underlying evidence was inadmissible.

## CONCLUSION

For the aforementioned reasons, Tyrin Gayle should be granted a judgment of acquittal on all counts and the case dismissed in its entirety or, in the alternative, a new trial should be ordered.

DATED:        New York, New York
              March 14, 2018

                            Respectfully submitted,

                            By:     /s/ Calvin H. Scholar
                                    Attorney for Tyrin Gayle
                                    The C.H. Scholar Law Firm, P.L.L.C.
                                    225 Broadway-Suite 715
                                    New York, New York 10007
                                    Telephone: (212) 323-6922
                                    Facsimile: (212) 323-6923


TO:

The Honorable Cathy Seibel
United States District Judge
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

AUSA Maureen Comey
AUSA Lauren Schorr
AUSA Jacqueline Kelly
United States Attorney
300 Quarropas Street
White Plains, New York 10601