UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                  :

   UNITED STATES OF AMERICA,         :
                                     :

           - v. -              :       S8 16 Cr. 361 (CS)
                                       :

   TYRIN GAYLE,                 :
      a/k/a "Spazzo,"          :
                                       :

               Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# MEMORANDUM OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANT'S POST-TRIAL MOTIONS

 

GEOFFREY S. BERMAN
United States Attorney for the Southern
District of New York
One St. Andrew's Plaza
New York, New York 10007

Maurene Comey
Jacqueline Kelly
Lauren Schorr
Assistant United States Attorneys
-Of Counsel-

The Government respectfully submits this memorandum in response to the motions of the defendant, Tyrin Gayle, for a judgment of acquittal and for a new trial pursuant to Rule 29 and Rule 33 of the Federal Rules of Criminal Procedure.  Gayle claims that the verdict should be set aside because (1) the cooperating witnesses' testimony was not credible; (2) there was insufficient evidence to support a conviction on any count; (3) the jury was not fair and impartial; and (4) certain evidence was improperly admitted.  The claims are meritless, and the motions should be denied.

## BACKGROUND

A grand jury in the Southern District of New York returned Indictment S8 16 Cr. 361 (CS), charging Gayle with: (1) participating in a racketeering conspiracy as part of a street gang known as the Yellow Tape Money Gang ("YTMG" or the "Enterprise") from in or about 2015 to in or about May 2016, in violation of 18 U.S.C. § 1962(d); attempting to murder Southside Gang members on or about December 11, 2015, in violation of 18 U.S.C. § 1659(a)(5); attempting to murder Southside Gang members, which resulted in injury to an innocent bystander, on or about February 21, 2016, in violation of 18 U.S.C. § 1959(a)(3) and (a)(5); conspiring to distribute more than 280 grams of crack cocaine from at least in or about 2015 up to and including in or about May 2016, in violation of 21 U.S.C. §  841(a)(1), 841(b)(1)(A) and 846; using minors in drug operations from at least in or about 2015 to in or about May 2016, in violation of 21 U.S.C. § 861(a)(1); and providing, carrying, and using firearms during and in relation to crimes of violence and narcotics trafficking from at least in or about 2015 up to and including in or about May 2016, some of which were discharged, in violation of 18 U.S.C. § 924(c)(1)(A)(iii).  All of these aforementioned charges were committed in furtherance of the YTMG enterprise.  On September 19, 2017, following a two-week trial, Gayle was convicted on all counts.

At trial, three cooperating witnesses—Laquan Falls, Michael Azua, and Brendan

Germaine—testified for the Government.  Falls and Germaine testified about, *inter alia*, their membership in YTMG, which was led by Gayle; their participation in various crimes with Gayle, including the distribution of crack cocaine, the distribution of heroin, and the possession of firearms; and their direct knowledge of Gayle's participation in other crimes as a member of YTMG, including the defendant's use, brandishing, and discharge of firearms and participation in multiple shootings.  Michael Azua, a member of a Poughkeepsie street gang allied with YTMG's rival gang in Newburgh, testified about the attempted murder charged in Count Two of the S8 Indictment.  Azua was present in the vicinity of where the shooting took place and witnessed a YTMG member shooting from a car that subsequently crashed nearby.   The testimony of the Cooperating Witnesses was corroborated by other evidence, including Facebook posts and videos by the defendant and other YTMG members in which the defendant and his fellow gang members claimed membership in YTMG and threatened rivals; drugs seized from controlled purchases from the defendant; video and audio recordings of those controlled purchases; crime scene photographs from the attempted murders charged in Counts Two and Three; multiple seized firearms, including one from the scene of one of the attempted murders; law enforcement witness testimony; video surveillance; and eyewitness testimony.

## DISCUSSION

## I. THE DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL SHOULD BE DENIED

The defendant moves for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 on two grounds: first, that the cooperating witnesses' testimony was incredible as a matter of law, and second, that there was insufficient evidence to support a conviction on any count.  For the following reasons, the defendant's Rule 29 motion should be denied.

### A.   Applicable Law

Federal Rule of Criminal Procedure 29 provides that a court may set a verdict aside if it finds that the evidence at trial was "insufficient to sustain a conviction."  A defendant seeking to set aside a verdict on this basis "bears a heavy burden."  *See United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (internal quotation marks omitted).  In reviewing such a motion, the Court views the evidence "in the light most favorable to the Government and draw[s] all reasonable inferences in its favor."  *United States v. Autuori*, 212 F.3d 105, 108 (2d Cir. 2000). The jury's verdict must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Dhinsa*, 243 F.3d 635, 648 (2d Cir. 2001) (internal quotation marks omitted).  "In other words, the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999).

When considering a Rule 29 motion, where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the Court] must let the jury decide the matter."  *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000).  Thus, the task of choosing among the permissible competing inferences that can be drawn from the evidence is for the jury, not for the reviewing court.  *See, e.g., United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (when there are "competing interests, we must defer to the jury's choice" because "it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence."); *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) ("[C]ourts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal.").

"Pieces of evidence must be viewed not in isolation but in conjunction, and when evaluating the sufficiency of the evidence, courts do not assess witness credibility, resolve inconsistent testimony against the verdict, or otherwise weigh the significance of the evidence." *United States v. Thomas*, 981 F. Supp. 2d 244, 243-44 (S.D.N.Y. 2013). In other words, the court "may not substitute [its] own determinations of credibility or relative weight of the evidence for that of the jury." *Autuori*, 212 F.3d at 114. Further, the test should be applied "to the totality of the government's case and not to each element, as each fact may gain color from others." *Guadagna*, 183 F.3d at 130.

The law does not require the Government to present any particular type of evidence to withstand a Rule 29 motion, and the Government's case may in fact be based "entirely on circumstantial evidence." *United States v. Sureff*, 15 F.3d 225, 228 (2d Cir. 1994). Indeed, "a conviction may be supported only by the uncorroborated testimony of a single [witness] . . . if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt. Any lack of corroboration goes merely to the weight of the evidence, not to its sufficiency." *United States v. Parker*, 903 F.2d 91, 96-97 (2d Cir. 1990).

### B.  The Cooperating Witnesses Testified Credibly

As part of the basis for the defendant's motion for acquittal pursuant to Federal Rule of Criminal Procedure 29, he argues that the testimony of cooperating witnesses Brendan Germain, Michael Azua, and Laquan Falls (collectively, the "Cooperating Witnesses"), was "incredible as a matter of law." *See* Def. Br. at 14, 15, 17. This argument fails.

The credibility of a testifying witness is particularly within the province of the jury. *See United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) ("It is the province of the jury and

not of the court to determine whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony." (internal quotation marks omitted)).  Moreover, "[w]here there are conflicts in the testimony, [the Court] must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses."  *Id.* (quoting *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011)).  In the defendant's case, the evidence presented to the jury was more than sufficient for a reasonable juror to conclude that the Cooperating Witnesses were credible and that the Government had met its burden of proving the defendant's guilt.

### 1.   The Testimony of Brendan Germain

The defendant takes issue with various portions of each of the Cooperating Witnesses' testimony.  First, with regard to Brendan Germain, the defendant argues that Germain's "lack of credibility" was "best highlighted" by his testimony regarding YTMG member Armad Evans, a/k/a "Yellow."  Def. Br. at 2.  As set forth in the defendant's motion, during one portion of Germain's direct examination, Germain affirmatively answered that "Yellow" was "just a guy from Williams Street."  Tr. at 921.  Throughout his testimony, however, including after the Court sought clarification regarding this response, Germaine repeatedly identified "Yellow" as a member of YTMG.  *See, e.g., id.* at 924, 769, 771, 78, 783, 81, 839, 854, 878, 879, 897, 925, 933, 935.  The singular response that the defendant highlights therefore does not meaningfully undermine Germain's testimony that Evans was a member of YTMG.  In any event, whether Evans was a member or just an associate of YTMG does not bear on the remainder of Germain's testimony, including testimony regarding the crimes Evans committed with the defendant and other YTMG members.

5

The defendant also asserts that Germain's testimony regarding the defendant's participation in the discharge of firearms was not credible and uncorroborated.  Def. Br. at 4, 5. On direct examination, Germaine testified regarding various shootings in which he had either personally witnessed the defendant participate or that the defendant told him about.  *See* Tr. at 904, 905, 918 – 920, 920 – 931, 933 – 941.  As to the two shootings charged in the S8 Indictment, Germain's testimony was corroborated by ample independent evidence.  With respect to the December 11, 2015 shooting charged in Count Two, the evidence included, among other things, eyewitness testimony from Ophra Wolf describing a black male firing from the backseat of the defendant's car at the scene of the shooting; law enforcement testimony regarding the defendant's presence at the scene; the .38 caliber firearm seized at the scene, which was consistent with the defendant's .38 caliber firearm that Germain testified YTMG members David Brown and Gabriel Warren took to the December 11 shooting; and the testimony of Laquan Falls and Michael Azua regarding the shooting.   With respect to the February 21, 2016 shooting charged in Count Three, the evidence included, among other things, law enforcement testimony regarding the charged shooting and the shooting of Laquan Falls that occurred shortly beforehand; testimony from Laquan Falls regarding his own injuries and the defendant's admissions to him after completing the February 21 shooting; text messages from the defendant's cellphone; pole camera surveillance footage depicting the car used by the defendant in the shooting at the scene; and law enforcement testimony establishing that a car with the same physical description was located at the defendant's residence shortly after the shooting and was warm to the touch.

The significance of the corroborating evidence is further underscored by Germain's

testimony that he began cooperating and pled guilty in advance of viewing any other evidence in the case produced in discovery. Tr. at 1015. With this context, a reasonable juror could easily have credited Germaine's testimony regarding the defendant's participation in, and aiding and abetting of, the discharge of firearms in connection with, at a minimum, these two gang-related shootings.

The defendant's remaining arguments regarding Germain's credibility, which relate specifically to collateral matters that arose in relation to the other Cooperating Witnesses and during cross-examination, and are discussed in detail below.

### 2. The Testimony of Michael Azua

The defendant argues that Michael Azua was incredible as a matter of law because: (1) he did not identify the defendant as a member of YTMG; (2) no other witness testified that someone in the defendant's car had a firearm at the time of the December 11, 2015 shooting, and (3) that Azua's testimony was made incredible as a matter of law because Germain attempted to communicate with him while they were both detained at GEO detention center. Def. Br. at 15. These arguments do not discredit Azua's testimony as a matter of law.

As an initial matter, Azua did not purport to know the defendant. Rather, his testimony on direct examination focused on his personal observations of YTMG member David Brown at the scene of the December 11, 2015 shooting. Specifically, Azua testified that he was a member of a Poughkeepsie street gang allied with YTMG's rival, the Southside gang, that he was familiar with several YTMG members including David Brown, a/k/a "Baby Thot," that he was present with Southside members in the vicinity of South Street and Liberty Street in Newburgh when "Baby Thot" shot from a black car with two other people in it as the car drove into the

intersection, and that the car then crashed into a tree.  Tr. at 528, 548, 549, 553 – 55.  Contrary to the defendant's assertion, Azua was not the only witness who observed someone in the car with a gun.  Eyewitness Ophra Wolf testified that she observed a car speed into the intersection of South Street and Liberty Street, an African American male reach out of the car and shoot at two men on a stoop at the corner, and the car then crash into a tree.  Tr. at 1103 – 07.  Wolf's testimony thus substantially corroborated Azua's recounting of the shooting.

Finally, Azua's testimony was not made "incredible as a matter of law" by Germain's testimony.  Azua described on direct examination that Germain sent a message to him at GEO detention facility through other inmates, asking Azua to speak to the prosecutor about lifting a separation order at the jail so that Germain could resume his work duty at the jail.  Tr. at 577 – 78, 580.  Azua testified that he sent a message back to Germain that he had asked the prosecutor.  *Id.* at 580.  Azua further testified that there was no further contact, or attempted contact, between them.  When Germain asked about this incident, he testified that he learned that there was a separation order with Azua at GEO, that he wanted the separation lifted so he could resume his job in the kitchen, and that another inmate spoke to Azua about having the separation lifted.  Tr. at 1017 – 18.  Germain denied having requested the inmate to intervene on his behalf and confirmed that he had no other contact with Azua.  *Id.* at 1018.  Azua and Germain's testimony on this subject uniformly demonstrated that Germain and Azua had no direct contact with each other, no contact whatsoever regarding this case, and no opportunity to collude.  The interaction, and the relevant trial testimony, thus comes nowhere close to establishing that Azua's testimony was "incredible as a matter of law" and could not have been credited by the jury.

### 3.   The Testimony of Laquan Falls

Turning to the testimony of Laquan Falls, the defendant argues that: (1) Falls' "false statements" regarding his first meeting with the Government and inconsistencies between his and Germain's testimony vitiate any "value that Falls had as a witness," and (2) that his testimony was the result of improper leading.  Def. Br. at 16.  Falls readily admitted on direct examination that he initially lied to the Government about being a member of YTMG and about possessing guns, but subsequently pled guilty to charges encompassing that conduct.  Tr. at 325 – 26.  As to the defendant's second argument, the defendant does not point to any material inconsistencies between Falls' testimony and Germain's beyond their differing opinions of whether Rashun Evans[1] was a member or merely an associate of YTMG.  Def. Br. at 16.  This distinction falls far short of demonstrating that either witness was not credible.  Finally, the defendant's argument that Falls' testimony was the result of improper questioning does not go to sufficiency of the evidence nor diminish or negate the probative value of Falls' testimony on both direct and cross-examination.[2]

In sum, although the defendant disagrees with the jury's assessment of the Cooperating Witnesses' credibility, there is no basis to upset the jury's verdict.  *See United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 158–59 (2d Cir. 2008) ("In order to avoid usurping the role of the jury, courts must defer to the jury's assessment of witness credibility and the jury's resolution

---

[1] The defendant's motion wrongly identifies Rashun Evans as "Rashun Brown."  Def. Br. at 16.

[2] Indeed, even in the context of a motion for a new trial, the Second Circuit has approvingly noted that "[a]n almost total unwillingness to reverse for infractions has been manifested by appellate courts." *United States v. DeFiore*, 720 F.2d 757, 764 (2d Cir. 1983) (internal quotations and citation omitted) (denying motion seeking reversal for alleged prosecutorial misconduct based in part on the use of leading questions at trial).

of conflicting testimony when reviewing the sufficiency of the evidence." (internal citations and quotation marks omitted)).  Rather, as the Second Circuit has emphasized, "the proper place for a challenge to a witness's credibility is 'in cross-examination and in subsequent argument to the jury, not in an appellate brief.'"  *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989 (quoting *United States v. Friedman*, 854 F.2d 535, 558 (2d Cir. 1988)).  It is then for the jury to decide how those arguments bear on "the weight [it] should accord to the evidence."  *United States v. Truman*, 688 F.3d 129, 140 (2d Cir. 2012).

Indeed, at trial, defense counsel challenged the credibility of YTMG members Falls and Germain on cross-examination.  Defense counsel, for instance, questioned Falls at length about small inconsistencies in his statements to the Government regarding the quantity of drugs he sold.  Tr. at 340-44.  Germain's credibility was even more exhaustively challenged on cross-examination.  Ultimately, as detailed in the eight-page trial transcript excerpt included in the defendant's motion, Germain testified on cross-examination that he had written several prison notes, or "kites," to the defendant while in custody following his arrest despite initially denying that he wrote to the defendant while in jail.  Tr. at 1058-73.  With the exception of this collateral matter, however, defense counsel's cross-examination of Germain revealed no significant inaccuracies or falsehoods in his testimony on direct examination, including his testimony regarding the defendant's offense conduct.

Having been presented with the testimony of each of the Cooperating Witnesses on direct and cross-examination, it is the "'province of the jury and not of the Court,' to determine whether a witness who may have been "inaccurate, contradictory and even untruthful in some respects" was nonetheless "entirely credible in the essentials of his testimony."  *O'Connor*, 650

10

F.3d at 855 (quoting *United States v. Tropiano*, 418 F.2d 1069, 1074 (2d Cir. 1969), *cert. denied*, 397 U.S. 1021 (1970)).  There is no basis here to find that the jury improperly relied on testimony that was incredible on its face.

Moreover, this is far from the hypothetical case where a defendant's conviction hinged on one uncorroborated witness' credibility.  Rather, the Cooperating Witnesses' testimony in this case was corroborated by a wealth of other evidence, including social media posts and videos by the defendant and his co-conspirators, text messages and phone calls from the defendant's cellphone, physical evidence including drug seizures from the defendant and multiple firearms, crime scene photographs, and other witness testimony.  In short, the testimony of each of the Cooperating Witnesses was far from "incredible as a matter of law" and the credibility determination of the jury regarding these witnesses should not be disturbed by the Court.

### C.  There was Sufficient Evidence to Sustain the Defendant's Conviction on all Counts

In support of his Rule 29 motion, the defendant also argues that there was insufficient evidence to support convictions on any count in the Indictment.  The defendant reiterates his position that the testimony of the cooperating witnesses' was "not credible on its face" and that "any remaining testimony or evidence that supported the Government's theory of guilt was obtained through the use of improper questioning which should have been stricken from the record."  Def. Br. at 17.  These arguments fail and the Court should uphold its prior ruling denying the defendant's Rule 29 motion.

The defendant's argument again relies heavily, and indeed almost exclusively, on the cooperating witnesses' testimony, without regard to the other evidence at trial.  For the reasons articulated above, the evidence at trial was more than sufficient for a reasonable juror to

11

conclude that the Cooperating Witnesses were credible and that their testimony supported a conviction on each count of the Indictment.  Reviewing the Cooperating Witnesses' testimony "in the light most favorable to the Government and draw[ing] all reasonable inferences in its favor," the defendant's argument should be rejected on this basis alone.  *See Autuori*, 212 F.3d at 108.

The defendant makes almost no mention of the other evidence presented at trial, all of which corroborated the Cooperating Witnesses' testimony.  And that is because the wealth of independent evidence presented at his trial makes clear that there was overwhelming proof of his guilt on all counts.  Once the Court considers the other evidence, in conjunction with the Cooperating Witnesses' testimony, there can be no question that "any rational trier of fact could have found the essential elements of [all of the crimes] beyond a reasonable doubt."  *See Dhinsa*, 243 F.3d at 648.

As to the racketeering conspiracy count (Count One), the defendant argues that, because the "cooperator testimony was incredible as a matter of law, there was no credible evidence that Gayle had joined the racketeering conspiracy."  Def Br. at 18.  The defendant's argument fails to account for the ample evidence of the defendant's membership in the racketeering conspiracy, which corroborates the Cooperating Witnesses' testimony.  Moreover, even putting aside the Cooperating Witnesses, that other evidence at trial was sufficient to convict the defendant of the racketeering count.  The evidence at trial included numerous Facebook posts and videos where, among other things: the defendant *identified himself* as a member of YTMG; he identified his fellow gang members by name and as members of YTMG; the defendant and other members of YTMG displayed guns and drug proceeds; the defendant and other members of YTMG taunted

their rival gang, Southside, including with threats of violence; the defendant described himself as the "King of Newburgh . . . the Big Homey," in reference to his leadership role in the gang; and the defendant sold crack and answered a drug customer's call in the presence of other YTMG members. *See, e.g.*, GX 150, 152, 101-A, 102-A, 103-A, 108-A, 120, 121, 122, 123, 124, 127, 134. The evidence also included Facebook messages in which the defendant exchanged taunts with members of Southside, and in which other members of YTMG, David Brown and Laquan Falls, discussed bringing a firearm to the defendant. *See, e.g.*, GX 101-C,   This evidence alone was sufficient to convict.

The defendant similarly argues that "there was a lack of credible evidence to sustain convictions for the violent acts in aid of racketeering alleged in Counts Two and Three."  Def. Br. at 18.  The defendant's argument relies solely on his challenge to the Cooperating Witnesses' credibility; it does not consider, at all, the other evidence presented at trial that corroborates the Cooperating Witnesses' testimony.  As articulated above, the Cooperating Witnesses' testimony regarding the December 11, 2015 and February 21, 2016 shootings, and the defendant's role in them, was corroborated by ample other evidence, including for the December 11 shooting, eyewitness testimony, law enforcement testimony, and physical evidence, and for the February 21 shooting, law enforcement testimony, text messages from the defendant's cellphone, and pole camera surveillance footage.  All of this evidence, viewed in its entirety, is clearly sufficient to sustain a conviction on Counts Two and Three.  *See Thomas*, 981 F. Supp. 2d at 243-44.

As to the narcotics conspiracy count (Count Four), the defendant claims there was a "lack of credible evidence that connected Gayle to the narcotics conspiracy," and drug weight found by the jury.  Def. Br. at 18.  Again, the defendant ignores the overwhelming evidence of the

defendant's involvement in the narcotics conspiracy, even without the testimony of the Cooperating Witnesses. Among other things, the evidence at trial included Facebook videos during which the defendant sold crack and answered a drug customer's call while with other YTMG members, *see* GX 123, 127; nine controlled purchases of crack cocaine from the defendant including purchases where the defendant was accompanied by other YTMG members, *see* GX 410, 420, 421, 430, 440, 450, 460, 470, 480, 490; controlled purchases of crack cocaine from other members of YTMG; text messages from the defendant's cellphone arranging drug transactions, *see* GX 501, 511; and crack cocaine seized the defendant's house, GX 362, outside of Germain's house, GX 302, and inside of Gabriel Warren's car, GX 342. This evidence is independent proof of the defendant's involvement in the narcotics conspiracy and corroborates Falls's and Germain's testimony regarding YTMG, and specifically, the defendant's, daily sales of crack cocaine with other YTMG members. *See, e.g.*, Tr. at 173-86, 861-62, 864-66. As the Court stated in denying the defendant's Rule 29 motion:

> I think the evidence is more than adequate for the jury to find that this was a common scheme or plan and that all of the other elements of conspiracy are met from the testimony of either Falls or Germain, not to mention all the corroboration of those witnesses. And, likewise, Germain's personal drugs alone get you over 280 grams. And it seems to me, even if the jury only considered Mr. Gayle's personal sales, given what he sold and the fact – if they accept that he was out there every day, his personal sales probably get you over 280 grams. But I think if they find a conspiracy, which they easily could, they could also easily find more than 280 grams.

Tr. at 1355-56. For those same reasons, the defendant Rule 29 motion should be denied as to Count Four.

As to the use of a minor count (Count Five), the defendant argues that the evidence of David Brown and Armad Evans was insufficient as a matter of law because the Cooperating

14

Witnesses were not credible and because the Government did not supply evidence of an actual date of birth.  These arguments should also be rejected.  Both Falls and Germain testified that Brown was 17 years old during much of the charged conspiracy (2015 to 2016).  *See, e.g.*, Tr. at 163-64, 188, 869-70.  This testimony was corroborated by Detective Rodriguez who confirmed Brown's age during the course of the investigation into YTMG in 2015 and 2016.  In addition, the evidence at trial included Brown's Facebook account, which included posts celebrating Brown's 18th birthday in April 2016 (*see* Exhibit 107).  As the Court ruled in rejecting the defendant's Rule 29 motion, this evidence was sufficient for any rational trier of fact to concluded that David Brown was 17 for the time period of the conspiracy.  Tr. at 1357.  Moreover, the evidence at trial clearly established that the defendant used Brown in the narcotics conspiracy, including Falls's and Germain's testimony in that regard, and Facebook evidence corroborating their description of the relationship between the defendant and Brown.  The defendant's argument in support of a Rule 29 motion on this count principally rests on his view that the Government should have introduced other documentary evidence of David Brown's age.  There is no requirement, however, of what kind of evidence the Government must present; indeed, the Government's case may be based "entirely on circumstantial evidence."  *See Sureff*, 15 F.3d at 228.  Accordingly, the defendant's motion should be denied.

Regarding the firearms count (Count Six), the defendant argues that "no unbiased witness testified that they ever observed Gayle possess, brandish, or discharge a weapon."  Def. Br. at 18.  The evidence at trial was more than sufficient to establish the defendant's guilt of this offense, both as a principal and as an aider and abettor.  The Cooperating Witnesses testified extensively about the gang's possession of firearms that were shared among the members and used in

furtherance of the gang and its narcotics operation, as well as the defendant's possession, use, and storage of firearms as a member and leader of YTMG. *See* Tr. at 202-22, 224, 879-95. Other evidence presented at trial corroborated their testimony, including, among other things: a Facebook video featuring the defendant, in which Falls, Brown, and Armad Evans display the defendant's Tec-9 firearm; a search on the defendant's cellphone for "Tec-9"; Facebook posts by the defendant that unmistakably describe the use of firearms as a member of YTMG; Facebook posts by other members of YTMG possessing guns and taunting rival gang members; eight firearms seized from YTMG's territory and the houses of YTMG members; and all of the evidence demonstrating the defendant's involvement in the December 11, 2015 shooting and the February 21, 2016 shooting. *See, e.g.*, GX 122, 123, 124, 202, 221-23, 304-06, 324. Based on this evidence, considered as a whole, a rational juror certainly could have found the essential elements of the charged crime beyond a reasonable doubt.

Finally, as to the obstruction of justice count (Count Seven), the defendant claims that judgment of acquittal should be entered because Germain was not credible as a matter of law, particularly as to his testimony regarding kites exchanged between the defendant and Germain. For the reasons articulated above, this argument should be rejected. Furthermore, the defendant appears to claim that Germain "had requested that Gayle do something for Germain," which somehow discredits the evidence supporting this charge. Notably, the kites presented to Germain on cross-examination are not in evidence and were not even sought to be introduced. Germain's testimony regarding the kites did not establish or even suggest that Germain had made any request from Gayle. Thus, there is nothing in the record regarding any purported requests

that Germain made to the defendant while incarcerated.[3]  In any event, the evidence at trial clearly permitted any rational juror to find that the elements of this count were satisfied.  The jury saw handwritten notes in which Gayle urged Germain to sign a false affidavit attesting that Germain had not witnessed Gayle commit any crimes.  They also saw a typed, notarized "Affidavit" from the defendant in which he falsely attested that he had not seen Germain commit any crimes.  The jury also heard testimony and saw exhibits from the notary at the jail, which confirm that the defendant saw the notary on the date the defendant's false affidavit was signed.

Accordingly, the defendant's Rule 29 motion for judgment of acquittal should be denied in its entirety.

## II.    THE DEFENDANT'S MOTION FOR A NEW TRIAL SHOULD BE DENIED

### A.  Applicable Law

Rule 33 allows a court to grant a new trial when the "interest of justice so requires."  A court will grant a new trial only where there is "a real concern that an innocent person may have been convicted."  *United States* v. *Sanchez*, 969 F.2d 1409, 1414 (2d Cir.1992).  The court must find that "it would be a manifest injustice to let the guilty verdict stand."  *Id.* (internal quotation marks omitted).

### B.  There Was No Error in Jury Selection

The defendant argues for a new trial pursuant to Rule 33 because two jurors had "expressed potential prejudice against the defendant and against the subject matter of the instant

---

[3] The defendant argues that Germain "attempted to obtain incriminating statements from Gayle while he was an agent of the Government and a cooperator" in violation of the defendant's constitutional rights.  Def. Br. at 20.  However, as noted above, there is no evidence in the record supporting the defendant's claim that Germain requested that Gayle do something for him, and thus no evidence to support this alleged constitutional violation.

case," and they were "seated without fully exploring the nature of their prejudice."  Def. Br. at 21.  The defendant points to statements made by two jurors – Ms. Isabel Garcia and Mr. Paul Prencis – that he claims demonstrated potential bias and that the Court did not sufficiently explore.

"A district court is 'accorded ample discretion in determining how best to conduct . . . voir dire." *United States v. Lawes*, 292 F.3d 123, 128 (2d Cir. 2002).  Even when a defendant asks for further inquiry of a potential jury – which did not occur here – a district court has "broad discretion whether to pose a defendant's requested voir dire questions." *Id.* (internal quotations omitted).  Given the broad discretion afforded to district courts in voir dire, the Second Circuit rarely, if ever, reverses convictions for the court's "failure to ask a particular question on the voir dire of prospective jurors," unless the record, viewed as a whole, shows that the voir dire was so insufficient as to require reversal, such as where "(i) a voir dire so demonstrably brief and lacking in substance as to afford counsel too little information even to draw any conclusions about a potential juror's general outlook, experience, communication skills, intelligence or life-style, [internal quotations and citations omitted]; (ii) a failure to inquire about, or warn against, a systematic or pervasive bias, including one that may be short-lived but existence at the time of trial, in the community that would have been cured by asking a question posed by a party [internal quotations and citations omitted]; or (iii) a record viewed in its entirety suggesting a substantial possibility that a jury misunderstood its duty to weigh certain evidence fairly that would have been clarified by asking a requested voir dire question." *Id.* at 130.  None of those circumstances were present here, and the defendant does not claim as such.

Both jurors, Ms. Garcia and Mr. Prencis, answered in the affirmative to one question

18

during jury selection, question number 9 which asked, in relevant part: "Have you or has any relative or friend had any experience, directly or indirectly, with illegal narcotics?" Tr. at 124. As reflected in the transcript passages below, and contrary to the defendant's characterization of the voir dire, the Court inquired into the basis for their affirmative answers and whether, in light of their answers, the jurors could be fair and impartial in this case. The following exchange took place between the Court and Ms. Garcia:

| | |
|---|---|
| Court: | Number 9. Do you want to come up or can you talk about it from where you are? |
| Garcia: | No. It's just – I mean, I know people, like my friends, smoke marijuana, but nothing like crazy. |
| Court: | Socially? |
| Garcia: | Yes, more like that. |
| Court: | Anything about that fact that would affect you in a case like this, which is dealing with alleged distribution of heroin and crack? |
| Garcia: | Oh, no. |
| Court: | Any more yes answers? |
| Garcia: | No. |
| Court: | Never been a juror before? |
| Garcia: | No. |
| Court: | No police officers or lawyers in the family? |
| Garcia: | No. |
| Court: | Anything not covered by the questions that you think would affect your fairness? |
| Garcia: | No. |

Tr. at 124-25.  Nowhere in Ms. Garcia's answers did she suggest—as the defendant wrongly claims—that "any illicit drug that was stronger than marijuana was not to be tolerated," Def. Br. at 21, that "hard drugs were crazy," or that the fact that friends of hers socially smoked marijuana would affect her ability to be fair and impartial in this case.  Rather, Ms. Garcia answered that her friends socially smoked marijuana and, in answer to the Court asking, twice, whether there was anything, both covered and not covered by the questions, that would affect her ability to be fair, and Ms. Garcia stated, unequivocally "No."

Similarly, in response to Mr. Prencis's statement that he had something specific in mind in answer to question number 9, the following exchange took place:

| | |
|---|---|
| Court: | Can you tell me what it is? |
| Prencis: | I would rather not in front of everyone.  I don't think it would affect my ability to make a decision, though. |
| Court: | Well, let's hear what it is. |
| Prencis: | Okay. |
| | [At sidebar] |
| | About nine years ago, I'm a teacher, and we hired somebody as my assistant to also teach. I teach some high courses, AP calculus, computer science.  We hired somebody to do that.  He came in.  He worked for us for a couple of years.  He got into a car accident.  Took prescription drugs.  Got hooked on them.  Took a leave of absence.  Eventually started buying prescription drugs illegally.  And now he's dead.  And he was a good friend of mine.  So that's – |
| Court: | That's so sad. |
| Prencis: | Yeah.  Very sad.  So, yeah, I have a little bit of experience with this sort of thing. |
| Court: | Obviously, that's a terrible thing.  The question here is going to be whether you can be fair in a case where somebody is accused of selling |

20

drugs.  And one of the issues is going to be whether the government has proven that or not.  Do you think you can give both sides a fair trial?

Prencis:    I'm pretty sure I can be impartial to that.

Court:    And you're naturally emotional about your friend.  Is that going to cause you to make your decision based on anything other than the –

Prencis:    No, I don't think so.

Court:    So you think you can be fair to both sides?

Prencis:    Yes, yes.

[exchange between the Court and Mr. Prencis about Mr. Prencis's work and coverage]

Court:    All right.  I'll ask you the rest of the questions at your seat.  Let me just make sure counsel doesn't have any follow-up.

Braverman:    No.

Tr. at 198-200.  As with Ms. Garcia, the Court probed the basis of Mr. Prencis's affirmative answer, and asked, multiple times, whether his friend's overdose death would affect his ability to be fair to both sides.  Before ending the sidebar with Mr. Prencis, the Court confirmed that counsel did not have any follow up questions, to which defense counsel, Mr. Braverman, responded "No."

The Court's inquiry into these two jurors' affirmative answers to question number 9 was more than sufficient to satisfy the Court and the parties that both jurors could be fair and impartial as jurors in this case.  At the time of jury selection, defense counsel did not require further inquiry of these jurors, let alone move to strike either juror for cause or exercise a peremptory challenge.  The record simply does not support the defendant's contention that those two jurors were not fair and impartial or that the Court abused its discretion in any way in conducting jury selection.

21

### C. Admissibility of Certain Evidence

Finally, the defendant claims that the admission of testimony from Enrique Santos, in which the witness identified the same serial number of an iPhone recovered from the defendant in a phone extraction that Santos reviewed, was improper because Santos gave impermissible opinion testimony.  The defendant further argues that because Santos' testimony was necessary to authenticate the phone extraction for admission at trial, the extraction and the summary chart featuring text messages from that extraction were similarly impermissibly admitted.  This argument fails for multiple reasons.

### 1.    Applicable Law

Pursuant to Federal Rule of Evidence 602, a lay witness may testify to matters about which he "has personal knowledge," including both facts and, in certain circumstances governed by Rule 701, opinion.  When determining what constitutes factual, rather than opinion, testimony, the Second Circuit has noted that:

> "[T]he distinction between statements of fact and opinion is, at best, one of degree."  We need not adopt verbatim Judge Posner's observation that "[a]ll knowledge is inferential, and the combined effect of [Federal] Rules [of Evidence] 602 and 701 is to recognize this epistemological verity but at the same time to prevent the piling of inference upon inference to the point where testimony ceases to be reliable" to acknowledge its essential truth.

*United States v. Cuti*, 720 F.3d 453, 458 (2d Cir. 2013) (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 168 (1988) and *United States v. Giovannetti*, 919 F.2d 1223, 1226 (7th Cir. 1990)).

Where a lay witness's statements do include opinion, Federal Rule of Evidence 701 prohibits that witness providing such testimony unless the offered opinion is "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or

the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized

knowledge within the scope of Rule 702." FED R. EVID. 701.   The Second Circuit has clarified

that "[a] rational perception is one involving 'first-hand knowledge or observation.'"   *United*

*States v. Yannotti*, 541 F.3d 112, 125 (2d Cir. 2008) (quoting *United States v. Rea*, 958 F.2d

1206, 1215 (2d Cir. 1992).  Further, "the advisory note to the 2000 Amendments to Rule 701

provides that 'most courts have permitted the owner or officer of a business to testify to the value

or projected profits of the business, without the necessity of qualifying the witness as an …

expert . . . .   Such opinion testimony is admitted not because of experience, training or

specialized knowledge within the realm of an expert, but because of the particularized

knowledge that the witness has by virtue of his or her position in the business.'"   *Id.* (quoting

FED. R. EVID. 701, advisory committee's note).  Although such opinion testimony requires the

proper foundation establishing the witness's basis of knowledge, it does not require that the

witness be qualified as an expert in a particular field.  *See id.*; *see also United States v.*

*Tsekhanovich*, 507 F.3d 127, 129-30 (2d Cir. 2007).  Further, "[w]here the witness's opinion

testimony is the product of a 'reasoning process familiar to the average person in everyday life,'

the use of specialized vocabulary or reliance upon industry-specific background knowledge in a

lay witness's testimony does not trigger the strictures applied to expert testimony under FRE

702." *United States v. Rubin/Chambers*, 828 F. Supp. 2d 698, 704-05 (S.D.N.Y. 2011).

When a defendant fails to raise a timely objection at trial to an evidentiary ruling, an

argument challenging such a ruling in a post-trial motion is "subject to the plain error standard of

Rule 52(b)."  *United States v. Riley*, 90 F. Supp. 3d 176, 185 (S.D.N.Y. 2015); *see also United*

*States* v. *Lumiere*, 249 F. Supp. 3d 748, 754 (S.D.N.Y. 2017) ("Because [defendant] uniformly

failed to object on the grounds he now advances, his arguments are reviewed under the 'plain error' standard."). To satisfy this standard, a defendant must demonstrate that an evidentiary ruling was "an 'obvious' error that not only 'affected the outcome of the district court proceedings,' but also 'seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). Moreover, pursuant to Rule 52(b), "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." FED. R. CRIM. P. 2(a); *see also id.* Advisory Committee Notes ("This rule is a restatement of existing law, 28 U.S.C. former [section] 391 (second sentence): "On the hearing of any…motion for a new trial, in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties.").

### 2.    Discussion

As an initial matter, the defense did not object to the nature of Santos's testimony during trial. Rather, defense counsel's objections focused on authentication, maintaining that even with Santos's testimony, the Government had failed to authenticate the phone extraction contained in Exhibit 502. *See* Def. Ltr. dated Sept. 14, 2017 (dkt. no. 187); Tr. at 958, 966, 969-73, 1080-88; *see also* Tr. at 1083 ("I would just reiterate that the whole of our argument is that there's three issues here: That we're lacking chain of custody; that we're lacking someone with personal knowledge that can tell us that the contents on the phone is that of the contents on the hard drive; and third, Mr. Braverman came across several news articles this morning regarding the integrity of Cellebrite software, hacks and leaks that occurred earlier this year, in January 2017, and it was

a BBC article, so it's a reputable source, that stated that, because these hacks have occurred, it undermines the integrity of the software and that they could be using forensically unsound and merely experimental software.  So those three points.").  As made clear in the letter briefs filed during trial, the purpose for which the Government called Santos was expressly to address the authentication and chain of custody objections raised by defense counsel.  At no point did the defense object that Santos was providing impermissible expert testimony.  Indeed, such an objection would have been odd, as the Government expressly noted that it was willing to offer Santos as an expert should defense counsel or the Court believe such a step necessary.  Gov't Ltr. dated Sept. 12, 2017 (dkt. no. 185) at 3 n. 2 ("Although the Government does not seek to offer Santos as an expert, should defense counsel wish to *voir dire* Santos, the Government submits that such questioning would confirm that Santos both has a sufficient basis to testify to the below points and is sufficiently experienced to qualify as an expert in the extraction and analysis of cellphones."); Tr. at 970.  Defense counsel declined to *voir dire* Santos, did not seek a *Daubert* hearing, and did not object to the admission of his testimony as impermissible opinion testimony—either when the testimony was previewed beforehand or when Santos testified at trial.  *See* Tr. at 1246-65.

During trial, the defense's argument surrounding Santos's testimony focused entirely on whether the testimony would be sufficient to authenticate Exhibit 502.  It was this issue that the Court referenced when expressing concern that the Government may be "inviting an appellate issue"—a comment that the defense motion takes entirely out of context.  Tr. at 1082.  The surrounding circumstances, including the full argument and briefing leading up to that comment, demonstrate that the Court was referring to the defense's claim that Santos's testimony was

insufficient to authenticate Exhibit 502.  *See* Def. Ltr.; Gov't Ltr.; Tr. at 1080-87.  The comment was not made in the context of a discussion of opinion testimony or whether Santos should be qualified as an expert.  Again, such a comment would have been strange, given that the Government offered to qualify Santos as an expert should the Court or defense counsel believe such qualification necessary and given that defense counsel never once articulated any concern that Santos would present improper opinion testimony.  Accordingly, the defendant's argument that Santos's testimony constituted improper opinion testimony is subject to plain error review. *See* FED. R. CRIM. P. 52(b); *Lumiere*, 249 F. Supp. 3d at 754.

Given the lack of objection from defense counsel, the Government did not seek to offer Santos as an expert at trial because his testimony did not offer an opinion but instead consisted of facts Santos learned during the course of his employment and when reviewing two exhibits related to this trial.  Although the Court initially questioned whether Santos's testimony would require that he be qualified as an expert, the Government reiterated that Santos would not be offering his opinion that the extract contained in Exhibit 502 in fact came from the iPhone that was marked as Exhibit 500.  Tr. at 969-73.  Rather, Santos testified—based on his personal experience as an analyst in the United States Attorney's Office responsible for cellphone extractions—regarding the process he used to extract data from the phone offered by the Government, and the unique identifying number contained on the physical phone and on the data extraction.  Tr. at 1249-53.  He then identified where the unique number was located on Exhibit 500 and where that same number was located in the extraction contained in Exhibit 502.  1258-61.  In other words, Santos's testimony amounted to a description of his personal observations of two exhibits.  The jury was then left to draw its own conclusion regarding whether Exhibit 502

therefore came from Exhibit 500, and the Court instructed the jury accordingly.  *See* Tr. at 1261.

Santos's references to the placement of unique numbers on iPhones, the basic characteristics of a forensic image, and the location of unique numbers within a forensic image all reflected knowledge he gained through his time working in a field involving the details of cellphone manufacturing and extractions.  They did not involve any opinions but instead conveyed factual descriptions of processes about which Santos had learned during the course of his employment and observations he made regarding two exhibits.  Indeed, in many ways Santos's testimony echoed that of Samantha Slattery and Damon Rhea, both of whom testified without being qualified as experts regarding the general process of completing phone extractions and the specific extractions they completed in this case.  *See* Tr. at 665-79 (Slattery); Tr. at 679-87 (Rhea).  The defense does not suggest that Slattery or Rhea needed to be qualified as experts, and Santos's testimony falls into the same category.  All three witnesses testified to the general processes that they personally observed through their employment and to the specific processes that they carried out in this particular case.  None offered any opinions but instead simply stated facts based on their personal knowledge.  Like Slattery and Rhea, because Santos did not offer an opinion, his testimony is not governed by Federal Rule of Evidence 701.

Even if the Court determines that Santos's testimony included opinion, however, Santos's testimony regarding the basic definitions of an IMEI number and a forensic image in order to provide context for the serial numbers he observed on two exhibits is analogous to an accountant in a fraud case testifying about basic accounting principles in order to provide context for a description of particular transactions.  The Second Circuit has blessed the use of such testimony, explaining that witnesses who were "certified and experienced accountant[s] personally familiar

27

with the transactions at issue" could explain "the applicable accounting rules…in detail" in order to render "the reasoning process that the witnesses employed in answering [questions at trial] was straightforward and transparent to the jurors, who could readily discern whether the responses given were reliable." *Cuti*, 720 F.3d at 458. Similarly, Santos was properly permitted to explain the basic features of an IMEI number and a forensic image in order to provide context when he identified the same unique number on Exhibit 500 and in the forensic image contained in Exhibit 502. Santos's identification of what amounts to a serial number on two exhibits is certainly "the product of a 'reasoning process familiar to the average person in everyday life,'" and his "use of specialized vocabulary or reliance upon industry-specific background knowledge" in order to provide context for that identification "does not trigger the strictures applied to expert testimony under FRE 702." *Rubin/Chambers*, 828 F.Supp.2d at 704-05.

The defense motion points to several cases to insist that Santos's testimony was improper, all of which are distinguishable from the instant case. As an initial matter, all three involved circumstances in which the defense objected specifically to the opinions being offered at the time they were elicited, which was not the case here. *See United States v. Haynes*, 729 F.3d 178, 184 (2d Cir. 2013) ("The Government asked Officer Rabideau why the fuel light would be on when there was gas in the car, and defense counsel objected on the ground that the question called for expert testimony. The objection was overruled."); *United States v. Natal*, 849 F.3d 530, 535 (2d Cir. 2017) ("The government did not seek to show that Trawicki's testimony satisfied the requirements for admissible expert testimony under Federal Rule of Evidence 702, and the district court, over the defendants' objection, did not require the government to make this showing."); *United States v. Garcia*, 413 F.3d 201, 208-09 (2d Cir. 2005) (citing repeated

instances in which defense counsel objected during challenged testimony to the portions of
testimony conveying the witness's own conclusions regarding the role the defendant played in
the charged conspiracy).

 With respect to the specific testimony in each case, *Garcia* involved an express opinion
regarding a defendant's culpability in a charged crime. *See id.* at 213 ("Second, Klemick's
opinion did more than provide a 'summary' of Garcia's words and actions—by whomever they
were observed.  It told the jury that Klemick, an experienced DEA agent, had determined, based
on the total investigation of the charged crimes, that Garcia was a culpable member of the
conspiracy.").  Such opinion testimony was "based on the totality of information gathered by
various persons in the course of an investigation" and not simply the witness's own observations
and experiences. *Id.*  Santos, by contrast, did not offer any opinion regarding material facts of
this case, as his testimony exclusively focused on authenticating a single piece of evidence, and
the only statements that Santos made concerned his personal experience completing and
reviewing cellphone extractions and his observation of the same unique number on two specific
exhibits.

 The testimony in *Haynes*, which involved a witness's opinion regarding where drugs
must have been placed inside a vehicle's gas tank in order for a particular light to remain on
inside the vehicle, is likewise distinguishable because that witness drew ultimate conclusions
based on those observations. *Haynes*, 729 F.3d at 194-95.  By contrast, Santos simply pointed
out the location of a unique identifying number on two exhibits without remarking on what
conclusion should be drawn from the location of those numbers.  Santos's testimony would thus
be akin to the witness in *Haynes* showing the jury photographs of the gas tank and of the car

light that he observed and indicating specific details regarding those photographs without expressing any opinion as to what those details meant.  What pushed the *Haynes* testimony into the realm of impermissible expert opinion was the witness's declaration that the drugs in the gas tank must have caused the light to go on.

Similarly, the testimony in *Natal* explained several varying factors that cause a cellphone to use multiple cell towers during a single call and expressed opinions about how those different factors impact the conclusions to be drawn from particular data.  *See Natal*, 849 F.3d at 534-36.  The *Natal* case also involved calling separate law enforcement witnesses to testify that the cell tower opinion from the first witness led them to rule out a potential suspect in a charged arson.  *See id.* at 535.  Here, Santos again simply described the location of unique identifying numbers, the process of extracting data from a cellphone, and the location of a unique number on a cellphone and in such an extraction.  Santos did not express an opinion about what those numbers meant, and the Government did not introduce any other witnesses to opine based on Santos's testimony.  In short, the admission of Santos's testimony was not plain error.

In any event, even if the Court concludes that Santos provided improper opinion testimony—which it should not—there was still sufficient evidence in the record to authenticate Exhibit 502.  Taken together, the totality of the testimony regarding the seizure of Exhibit 500, its provision to Samantha Slattery at the FBI, Slattery requesting that the phone be extracted at Quantico, Slattery then receiving back Exhibit 502, and the contents of Exhibit 502 containing text messages and other information clearly indicating that it belonged to the defendant, was sufficient for "a reasonable juror [to] find that [Exhibit 502] was authentic."  *United States v. Ganias*, 824 F.3d 199, 234 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 569 (2016).  Such evidence

alone would have been sufficient to satisfy the low authenticity threshold to admit Exhibit 502 as well as its summary chart.  *See United States v. Bout*, 651 F. App'x 62, 63-64 (2d Cir. 2016).

Finally, even if all of these exhibits had not been properly authenticated and therefore should not have been admitted, the admission of Santos' testimony, Exhibit 502, and the summary chart of text messages from Exhibit 502 did not rise to the level of error meriting a new trial.  *See* FED. R. CRIM. P. 52(a).  Notably, the only case that the defense cites in which the Second Circuit concluded that the admission of improper opinion testimony was grounds for reversal of a conviction involved four other "significant errors" during the same trial.  *Haynes*, 729 F.3d at 197.  Indeed, the *Haynes* court expressly noted that "[i]ndividually, these errors may not provide a basis for vacating the defendant's conviction," and only granted a new trial because "when considered together" the multiple errors—including shackling the defendant in front of the jury, failing to investigate alleged juror misconduct, providing an improper *Allen* charge, and failing to strike other improper testimony—raised due process concerns warranting a new trial. *Id.*

By contrast, the admission of Santos's testimony, and the summary chart as a result, by no means rise to a level of error calling into question the fundamental fairness of the defendant's trial.  *See Natal*, 849 F.3d at 537 ([T]he admission here of lay opinion testimony on how cell phone towers operate was harmless and not reversible error. . . . . [S]ignificantly, the prosecution presented a very strong case against the defendants."); *Garcia*, 413 F.3d at 217 ("Although Klemick's challenged opinion testimony was inadmissible under Rule 701, we conclude that this single evidentiary error had no 'substantial and injurious effect or influence' on the jury verdict and, thus, was harmless."  (quoting *United States v. Dukagini*, 325 F.3d 45, 62 (2d Cir. 2003))).

31

Indeed, the Court observed at the conclusion of this trial that the Government presented "an overwhelming case" with ample evidence of the defendant's guilt.  Tr. at 1629.  Given the wealth of evidence of the defendant's guilt outlined above, separate and apart from the extraction from the defendant's iPhone, any error in admitting this small piece of evidence does not give rise to "a real concern that an innocent person may have been convicted."  *Sanchez*, 969 F.2d at 1414.  Accordingly, the motion for a new trial should be denied.

## CONCLUSION

For the foregoing reasons, the defendant's motions should be denied.

Dated: White Plains, New York
       April 11, 2018

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By:/s/_____
     Maurene Comey
     Jacqueline Kelly
     Lauren Schorr
     Assistant United States Attorneys
     (212) 637-2324
